IN THE MATTER OF ALGER HISS.

Suffolk. May 9, 1975. — August 5, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Attorney at Law. Practice, Civil,* Membership in the bar. *Supreme Judicial Court,* Membership in the bar. *Evidence,* Presumptions and burden of proof.

Conviction of perjury of a member of the bar of this Commonwealth and his subsequent disbarment were "conclusive evidence of his lack of moral character at the time of his removal from office." [450-451]

This court cannot presently say that any offense is so grave that an attorney disbarred therefor is automatically precluded from subsequently attempting to demonstrate that he has achieved a "present fitness," and has led a sufficiently exemplary life, to be reinstated as an attorney. [451-455]

One who has been convicted of a crime and disbarred therefor will not be disqualified for reinstatement to the bar solely because he continues to protest his innocence of the crime. [455-459]

Repentance by one convicted of a crime and disbarred therefor, or lack of repentance, is evidence to be considered in the evaluation of his character upon his petition for reinstatement to the bar. [455-456]

Statement of factors to be considered in judging whether one who has been convicted of a crime and disbarred therefor and seeks to be reinstated to the bar satisfies the standards for reinstatement set

forth in S.J.C. Rule 4:01, § 18 (4), 365 Mass. 696 (1974), and has demonstrated the requisite rehabilitation since disbarment. [456-459]

With respect to a mature man who had been convicted of perjury, tainted by a breach of confidence and trust, and had been disbarred and approximately twenty-three years later petitioned for reinstatement to the bar, findings by the Board of Bar Overseers that the petitioner "is presently of good moral character and . . . would almost certainly not commit any serious crime" and that granting the petition would "clearly have no actual. adverse effect upon the integrity of the Bar" were supported by substantial evidence, including evidence of the petitioner's good character since disbarment, of his pursuit of scholarly interests, and of his fitness to be reinstated, and a conclusion was warranted that the petitioner had sustained the burden imposed for reinstatement, and this court ordered the unopposed petition granted, although the petitioner held fast to his contention of innocence and admitted to no rehabilitation of character. [459-468]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on November 4, 1974.

The case was reserved and reported by *Reardon,* J.

*John F. Groden (John M. Reed & Harold Rosenwald* with him) for the petitioner.

*Robert J. DeGiacomo (Daniel Klubock & Barry Brown* with him) for the Board of Bar Overseers.

*Frederic G. Corneel & Edward J. Barshak,* for the Boston Bar Association, amicus curiae, submitted a brief.

TAURO, C.J.   Alger Hiss was struck from the roll of Massachusetts lawyers on August 1, 1952, and now seeks reinstatement.   The facts as disclosed by the record before us are as follows.   On January 25, 1950, Alger Hiss was convicted of two counts of perjury in his testimony before a Federal grand jury.   A previous trial had resulted in a jury disagreement, and a mistrial had been declared.   In particular, Hiss was found to have testified falsely (1) that he had never, nor had his wife in his presence, turned over documents or copies of documents of the United States Department of State or of any other organization of the Federal government to one Whittaker Chambers or to any other unauthorized person and

(2) that he thought he could say definitely that he had not seen Chambers after January 1, 1937. Chambers was the principal witness against Hiss and had been his principal accuser during hearings held prior to the grand jury investigation by the Committee on Un-American Activities of the House of Representatives.[1] After Hiss had exhausted his rights of appeal (*United States* v. *Hiss,* 185 F. 2d 822 [2d Cir. 1950], cert. den. 340 U. S. 948 [1951]; see also *United States* v. *Hiss,* 107 F. Supp. 128 [S. D. N. Y. 1952], affd. per curiam, 201 F. 2d 372 [2d. Cir. 1953], cert. den. 345 U. S. 942 [1953] [motion for a new trial]), he was committed to the United States penitentiary at Lewisburg, Pennsylvania, where he served some three and one-half years.

Following affirmance of the conviction, the Boston Bar Association filed an information with this court, setting forth the circumstances and a prayer for "such action as the Court may deem fit." The matter was duly set down for hearing before a single justice of this court, but, though given due notice of the hearing, Hiss, on the advice of counsel, failed to enter an appearance. On November 2, 1951, the single justice ordered Hiss defaulted and found the bar association's allegations to be true. On August 1, 1952, after arguments by counsel, judgment was entered by the single justice removing Hiss "from the office of Attorney-at-Law in the Courts of this Commonwealth."

On November 4, 1974, for the first time, Hiss, then age sixty-nine, filed a petition for reinstatement as an attorney and an accompanying affidavit which detailed his activities since his release from prison. The matter was referred to the Board of Bar Overseers (the board) pursuant to S.J.C. Rule 4:01, § 18 (4), 365 Mass. 696

---

[1] A more detailed history of events surrounding the trial and conviction may be found in *United States* v. *Hiss,* 185 F. 2d 822 (2d Cir. 1950), cert. den. 340 U.S. 948 (1951).

(1974).   The board members[2] heard evidence and filed a report, consisting of findings and recommendations for disposition.   The matter is before us now on reservation and report without decision of the single justice.   Three fundamental questions are presented for our determination:   (1) Were the crimes of which Hiss was convicted and for which he was disbarred so serious in nature that he is forever precluded from seeking reinstatement? (2) Are statements of repentance and recognition of guilt necessary prerequisites to reinstatement?   (3) Has Hiss demonstrated his fitness to practice law in the Commonwealth?

1.  At the outset, we stress that we are not here concerned with a review of the criminal case in which Hiss was tried, convicted and sentenced.[3]   In his trial, he received the full measure of due process rights and opportunities to contest allegations of guilt:   a trial before a jury of his peers supplemented by ample avenues of appeal.   Basic respect for the integrity and finality of a prior unreversed criminal judgment demands that it be conclusive on the issue of guilt and that an attorney not be permitted to retry the result at a much later date in his reinstatement proceedings.   Cf. *In the Matter of Braverman,* 271 Md. 196 (1974).   Hiss does not contend otherwise.   While, in some civil proceedings, we permit retrial of factual issues adjudicated previously in criminal cases (see, e.g., *Silva* v. *Silva,* 297 Mass. 217, 218 [1937]), "[s]omething different is involved . . . [here].
. . . A member of the bar whose name remains on the roll is in a sense held out by the Commonwealth, through the judicial department, as still entitled to confidence.   A conviction of crime, especially of serious crime, undermines public confidence in him.   The average citizen

---

[2] Pursuant to S.J.C. Rule 4:01, § 18 (4), the board could have referred the matter to a hearing committee, but the members chose to hear the evidence themselves.

[3] Hiss seeks reinstatement and not vindication.

would find it incongruous for the . . . [Federal government] on the one hand to adjudicate him guilty and deserving of punishment, and then, on the other hand, while his conviction and liability to punishment still stand [for the Commonwealth] to adjudicate him innocent and entitled to retain his membership in the bar." *Matter of Welansky*, 319 Mass. 205, 208-209 (1946).[4]    Accord, American Bar Association Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement, 131 (Final Draft 1970).[5]    Thus, Hiss comes before us now as a convicted perjurer, whose crime, a direct and reprehensible attack on the foundations of our judicial system, is further tainted by the breach of confidence and trust which underlay his conviction.    His conviction and subsequent disbarment are "conclusive evidence of his lack of moral character *at the time of his removal from office*" (emphasis supplied).    *Matter of Keenan*, 313 Mass. 186, 219 (1943).

2. Nevertheless, the serious nature of the crime and the conclusive evidence of past unfitness to serve as an attorney do not *necessarily* disqualify Hiss at the present time.    We cannot subscribe to the arguments advanced by the chief Bar Counsel (Bar Counsel)[6] that, because the

---

[4] In *Welansky*, we were concerned with retrial of criminal convictions in disbarment proceedings.    The result follows a fortiori in reinstatement proceedings.

[5] This special committee report addressed the problem of "[n]o provision making conviction of crime conclusive evidence of guilt for purposes of the disciplinary proceeding based on the conviction."

[6] The Bar Counsel and assistants are appointed by the board with the approval of this court pursuant to S.J.C. Rule 4:01, § 5 (3) (b), 365 Mass. 696 (1974).    The Bar Counsel is charged with the responsibility of "[investigating] all matters involving alleged misconduct by an attorney" and "[prosecuting] all disciplinary proceedings before hearing committees, the [b]oard and this court."    S.J.C. Rule 4:01, § 7 (1), (3), 365 Mass. 696 (1974).    The rules of this court provide that "at hearings conducted with respect to motions for reinstatement" the Bar Counsel "shall appear . . . with full rights to participate as a party."    S.J.C. Rule 4:01, § 7 (4), 365 Mass. 696 (1974).

offenses committed by Hiss are so serious, they forever bar reinstatement[7] irrespective of good conduct or reform.[8] Though in previous cases we intimated by way of dicta that there may be "offenses so serious that the attorney committing them can never again satisfy the court that he has become trustworthy" (*Matter of Keenan*, 314 Mass. 544, 548-549 [1943]; see, e.g., *Matter of Keenan*, 313 Mass. 186, 219, [1943]; *Centracchio, petitioner*, 345 Mass. 342, 346-347 [1963]), we cannot now say that any offense is so grave that a disbarred attorney is automatically precluded from attempting to demonstrate through ample and adequate proofs, drawn from conduct and social interactions, that he has achieved a "present fitness" (*In re Kone*, 90 Conn. 440, 442 [1916]) to serve as an attorney and has led a sufficiently exemplary life to inspire public confidence once again, in spite of his previous actions.[9]

---

[7] Some aspects of the board's findings and recommendations may be read to embrace this position: "With Mr. Hiss's conviction outstanding, unreversed, not subject to attack, and necessary for us to consider, all the other evidence of his present character cannot be of any weight." However, the context and remainder of the board's report make clear that the board does not subscribe to the full measure of its counsel's position.

[8] In view of what we say in the opinion, we need not consider or decide whether such a ruling would amount to a *conclusive* presumption frowned on by many courts. Compare *Vlandis* v. *Kline*, 412 U. S. 441, 446 (1973), *Leary* v. *United States*, 395 U. S. 6 (1969), and *Barnes* v. *United States*, 412 U. S. 837 (1973), with *Weinberger* v. *Salfi*, 422 U. S. 749 (1975).

[9] Other jurisdictions appear split on whether conviction for particularly heinous crimes will necessarily result in permanent disbarment. See generally American Bar Association Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement, 150 (Final Draft 1970); anno. 70 A. L. R. 2d 268, 276-279 (1960). A number of States permit reinstatement on a showing of rehabilitation despite conviction for serious crimes involving moral turpitude or breaches of trust. See, e.g., *Allen* v. *State Bar of Cal.* 58 Cal. 2d 912 (1962) (perjury); *In re May*, 249 S. W. 2d 798 (Ky. Ct. App. 1952) ("not forever . . . beyond the pale of respectability"); *In re Taylor*, 330 S. W. 2d 393 (Ky. Ct. App. 1959) (fraud on the court); *Ex Parte Marshall*, 165 Miss. 523 (1933)

Disbarment is not a permanent punishment imposed on delinquent attorneys as a supplement to the sanctions of the criminal law — "though it may have that practical effect. Its purpose is to exclude from the office of an attorney in the courts, for the preservation of the purity of the courts and the protection of the public, one who has demonstrated that he is not a proper person to hold such office." *Keenan, petitioner,* 310 Mass. 166, 169 (1941). Accord,[10] *Bar Assn. of the City of Boston* v. *Greenhood,* 168 Mass. 169, 183 (1897) ("protection of the public from attorneys who disregard their oath of office"); *Bar Assn. of the City of Boston* v. *Casey,* 211 Mass. 187, 192 (1912); *Matter of Keenan,* 314 Mass. 544, 546-547 (1943). The position of the Bar Counsel presupposes that certain disbarred attorneys, guilty of particularly heinous offenses against the judicial system, are incapable of meaningful reform which would qualify them to be attorneys and, further, that the public will never be willing to revise an earlier opinion that the offender was not a proper person to function as an attorney. If adopted the rule would provide that "no matter what a disbarred attorney's subsequent conduct

---

(blackmail). Cf. *March* v. *Committee of Bar Examrs.* 67 Cal. 2d 718 (1967) (first admission to bar; no conviction but false testimony before Congressional committee); *Williams* v. *Governors of the Fla. Bar,* 173 So. 2d 686 (Fla. 1965) (reinstatement considered and denied; conspiracy to thwart prosecution); *In re Sympson,* 322 S. W. 2d 808 (Mo. 1959) (criminal contempt for suborning perjury; not reinstated). Other States make conviction of certain serious crimes a ground for permanent disbarment. See, e.g., *People* v. *Buckles,* 167 Colo. 64 (1969) (statute); *In the Matter of Bennethum,* 278 Atl. 2d 831, 833 (Del. 1971); *People ex rel. Chicago Bar Assn.* v. *Reed,* 341 Ill. 573, 577 (1930); *In re Application of Van Wyck,* 225 Minn. 90 (1947); Tenn. Code Anno. § 29-310 (1955 and Supp. 1974) (cf. *Cantor* v. *Grievance Comms.* 189 Tenn. 536 [1949]).

[10] *In re Kone,* 90 Conn. 440, 442 (1916). *In re Barton,* 273 Md. 377, 381 (1974). *In re Application of Smith,* 220 Minn. 197, 199 (1945). *In re Sympson,* 322 S. W. 2d 808, 812 (Mo. 1959). *In re Petition of Morrison,* 45 S. D. 123, 129 (1922). *In re Enright,* 69 Vt. 317, 319 (1897).

may be; no matter how hard and successfully he has tried to live down his past and atone for his offense; no matter how complete his reformation — the door to restoration is forever sealed against him." *In re Stump*, 272 Ky. 593, 597-598 (1938). Such a harsh, unforgiving position is foreign to our system of reasonable, merciful justice. It denies any potentiality for reform of character. A fundamental precept of our system (particularly our correctional system[11]) is that men can be rehabilitated. "Rehabilitation . . . is a 'state of mind' and the law looks with favor upon rewarding with the opportunity to serve, one who has achieved 'reformation and regeneration.'" *March* v. *Committee of Bar Examrs.* 67 Cal. 2d 718, 732 (1967). Time and experience may mend flaws of character which allowed the immature man to err. The chastening effect of a severe sanction such as disbarment may redirect the energies and reform the values of even the mature miscreant. There is always the potentiality for reform, and fundamental fairness demands that the disbarred attorney have opportunity to adduce proofs.

The public welfare, "the true test" in all proceedings for reinstatement (*Matter of Keenan*, 314 Mass. 544, 547 [1943]), calls for no different result. There can be no harm in permitting any disbarred attorney to adduce proofs of his changed character. Certainly, the proceeding itself poses no threat to the public interest.[12] It does not guarantee readmission. Before he again will be entered on the rolls as an attorney eligible to practice, the disbarred attorney who has committed the grave offenses to which the Bar Counsel directs attention must bear a heavy burden of proof (see, *infra*, at 460) and pass the close scrutiny to which reviewing courts subject petitions

---

[11] "Even wrongdoers convicted of crime are given another chance." *In re Stump*, 272 Ky. 593, 598 (1938).

[12] It is appropriate to observe that a proceeding which fairly provides an opportunity to demonstrate good moral character cannot lower the standing of the bar or bring it into disrepute.

for reinstatement. Indeed, the proceeding may ultimately redound to the public benefit, for the attorney who can attain reinstatement in such a proceeding after having committed a grave offense could become a credit to the bar and an asset to those he serves.

3. In assessing Hiss's fitness for reinstatement to the bar, the Board of Bar Overseers considered itself bound by our decision in *Matter of Keenan*, 314 Mass. 544 (1943), to require admission of guilt and repentance as part of the proof of Hiss's present good moral character and rehabilitation. Accordingly, because Hiss continues to insist on his innocence, the board recommended that his petition for reinstatement be denied. The board wrote: "When the disbarment is wholly based upon the conviction of the petitioner of an offense which is clearly a 'serious crime' (perjury), which conviction has not been reversed, and the petitioner has not been pardoned, the task of a petitioner such as Mr. Hiss, who continues to assert his innocence, to satisfy this Board of his present good character, becomes logically impossible for him to meet under the law, as the Board conceives the law to be. . . . [S]o long as Mr. Hiss's conviction stands, and so long as he continues to deny his guilt of an offense of which he was convicted, after what was ruled to be a fair trial, the Board finds, *under the decisions by which it is bound,* that the petitioner has not satisfied us that his readmission would not be detrimental to the standing of the Bar, the administration of justice or to the public interest" (emphasis supplied).

Neither the controlling case law nor the legal standard for reinstatement to the bar requires that one who petitions for reinstatement must proclaim his repentance and affirm his adjudicated guilt. *Matter of Keenan*, 314 Mass. 544 (1943), cited by the board as dispositive, does not hold that repentance and admission of guilt are mandatory. In *Keenan, supra,* we considered a variety of factors relevant to reinstatement; repentance was but one of them. After a full review of the evidence

presented, we concluded that "in view of all the factors which must be taken into account" (*id.* at 550) Keenan should not be reinstated. The evidence held "forth no certainty that . . . [the petitioner] would not again fall a victim to the same weakness that was his first undoing." *Ibid.* Particular emphasis was placed on the "unusual history and background" (*id.* at 547) of the case — the sweeping public investigation into abuses and unprofessional conduct of the tort bar — and on the precedent that the case would be for similar petitions by others exposed in the same investigation. The failure of Keenan to admit guilt or repent[13] did not, any more than the other factors considered, determine the outcome. *Centracchio, petitioner,* 345 Mass. 342 (1963), the other case from this jurisdiction cited by the board, contains no explicit holding with respect to repentance. In fact, the petitioner was denied reinstatement though, through his conduct, he had given evidence of repentance.

The legal standard for reinstatement to the bar is set forth in S.J.C. Rule 4:01, § 18 (4), 365 Mass. 696 (1974). There is no mention of repentance as a prerequisite to admission: "The respondent-attorney . . . shall have the burden of demonstrating that he has the moral qualifications, competency and learning in law required for admission to practice law in this Commonwealth, and that his resumption of the practice of law will not be detrimental to the integrity and standing of the bar, the administration of justice, or to the public interest." In proceedings on petitions for reinstatement, we must ascertain that the prospective members of the bar are presently "trustworthy" (see *Bar Assn. of the City of Boston* v. *Greenhood,* 168 Mass. 169, 183 [1897];

---

[13] Note also that the court wrote that "[t]here was little evidence of repentance *or* reform" (emphasis supplied). *Matter of Keenan,* 314 Mass. at 550 (1943). Ample evidence of character reform would have been sufficient, in and of itself, to support reinstatement (though repentance alone would not have been).

*Keenan, petitioner,* 310 Mass. 166, 168 [1941]; *Kepler* v. *State Bar of Cal.* 216 Cal. 52, 55 [1932]; *In re Application of Smith,* 220 Minn. 197, 200 [1945]) and upright of character, not that they are willing to admit past mistakes. Statements of guilt and repentance may be desirable as evidence that the disbarred attorney recognizes his past wrongdoing and will attempt to avoid repetition in the future. However, to satisfy the requirements of present good moral character in the tests for reinstatement noted above, it is sufficient[14] that the petitioner adduce substantial proof that he has "such an appreciation of the distinctions between right and wrong in the conduct of men toward each other as will make him a fit and safe person to engage in the practice of law." *In re Koenig,* 152 Conn. 125, 132 (1964). See *In re Stump,* 272 Ky. 593, 598-599 (1938). Such an appreciation, if deeply felt and strongly anchored, will serve as a firm foundation and justification for the order of reinstatement. Mere words of repentance are easily uttered and just as easily forgotten.

The continued assertion of innocence in the face of a prior conviction does not, as might be argued, constitute *conclusive* proof of lack of the necessary moral character to merit reinstatement.[15] Though we deem prior judgments dispositive of all factual issues and deny attorneys subject to disciplinary proceedings the right to relitigate

---

[14] A number of jurisdictions do not require an avowal of repentance as a prerequisite to reinstatement. See, e.g., *In re Barton,* 273 Md. 377, 382 (1974); *Ex Parte Marshall,* 165 Miss. 523, 551-552 (1933); *In re Eddleman,* 77 Wash. 2d 42, 45, n. 1 (1969). But cf. *In the Matter of Bennethum,* 278 Atl. 2d 831, 833 (Del. 1971); *In re Application of Smith,* 220 Minn. 197, 202 (1945).

[15] The contrary position seems to have been adopted by the board: "Strict application of logical principles might, in fact, lead to the conclusion that the petitioner gives evidence of his present lack of moral character when he again testifies to his innocence of the original charge, in the face of a conviction which this Board, for purposes of its deliberations, must accept as establishing the fact of his guilt."

issues of guilt, we recognize that a convicted person may on sincere reasoning believe himself to be innocent. We also take cognizance of Hiss's argument[16] that miscarriages of justice are possible. Basically, his underlying theory is that innocent men conceivably could be convicted, that a contrary view would place a mantle of absolute and inviolate perfection on our system of justice, and that this is an attribute that cannot be claimed for any human institution or activity. We do not believe we can say with certainty in this case, or perhaps any case, what is the true state of mind of the petitioner. Thus, we cannot say that every person who, under oath, protests his innocence after conviction and refuses to repent is committing perjury.

Simple fairness and fundamental justice demand that the person who believes he is innocent though convicted should not be required to confess guilt to a criminal *act* he honestly believes he did not commit. For him, a rule requiring admission of guilt and repentance creates a cruel quandary: he may stand mute and lose his opportunity; or he may cast aside his hard-retained scruples and, paradoxically, commit what he regards as perjury to prove his worthiness to practice law. Men who are honest would prefer to relinquish the opportunity conditioned by this rule: "Circumstances may be made to bring innocence under the penalties of the law. If so brought, escape by confession of guilt . . . may be

---

[16] The Bar Counsel in his brief agrees that repentance and admission of guilt should not be conditions of reinstatement: "While an adjudication of guilt must stand as a determination of that fact, legally and judicially, binding upon the accused and all the world, all that is or can be demanded of the accused is that he shall accord full respect to and acquiescence in that finding and judgment. *It cannot be demanded that he deny his own conscience or his own knowledge, and that he assert a guilt which for him does not exist.* The *Keenan* case does not make such a demand. Repentance is only one of many factors that may be considered" (emphasis supplied).

The Boston Bar Association in its amicus brief took a similar position.

rejected, — preferring to be the victim of the law rather than its acknowledged transgressor — preferring death even to such certain infamy."[17] *Burdick* v. *United States,* 236 U. S. 79, 90-91 (1915). Honest men would suffer permanent disbarment under such a rule. Others, less sure of their moral positions, would be tempted to commit perjury by admitting to a nonexistent offense (or to an offense they believe is nonexistent) to secure reinstatement. So regarded, this rule, intended to maintain the integrity of the bar, would encourage corruption in these latter petitioners for reinstatement and, again paradoxically, might permit reinstatement of those least fit to serve. We do not consider in this context the person who admits committing the alleged criminal act but honestly believes it is not unlawful.

Accordingly, we refuse to disqualify a petitioner for reinstatement *solely* because he continues to protest his innocence of the crime of which he was convicted. Repentance[18] or lack of repentance is evidence, like any other, to be considered in the evaluation of a petitioner's character and of the likely repercussions of his requested reinstatement. However, nothing we have said here should be construed as detracting one iota from the fact that in considering Hiss's petition we consider him to be guilty as charged. Our discussion relates only to the issue whether Hiss must admit his guilt as condition to reinstatement.

4. Having resolved these preliminary questions of law, we pass now to consideration of Hiss's present fitness to serve as an attorney. The standards for reinstatement drawn from the rules of this court have been set forth

---

[17] The quotation refers to confession of guilt through acceptance of a pardon.

[18] Different principles may apply to cases in which the delinquent attorney should make restitution of misappropriated funds. We do not here decide what effect failure to make restitution should have on a petition for reinstatement.

(see pp. 456-457, *supra*). In judging whether a petitioner satisfies these standards and has demonstrated the requisite rehabilitation since disbarment, it is necessary to look to (1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment,[19] and (5) the petitioner's present competence in legal skills. See *Application of Spriggs*, 90 Ariz. 387, 388, n. 1 (1962); *In re Barton*, 273 Md. 377, 379 (1974); *In re Application of Strand*, 259 Minn. 379, 381 (1961); *In the Matter of the Petition of Seijas*, 63 Wash. 2d 865, 868-869 (1964). Cf. *In re Petition of Dawson*, 131 So. 2d 472, 474 (Fla. 1961). The judgment of disbarment "continues to be evidence against . . . [the petitioner] with respect to lack of moral character at later times in accordance with the principle that 'a state of things once proved to exist may generally be found to continue.' *Gladston* v. *McCarthy*, 302 Mass. 36, 37 [1938]. Whatever the offense for which a judgment of disbarment was entered, the person disbarred has a heavy burden on a subsequent petition for admission to the bar to overcome by evidence the weight of the facts adjudicated by such judgment and to establish affirmatively[20] that since his disbarment he has become 'a

---

[19] Since disbarment is not primarily a punishment for the offending lawyer, passage of time alone is insufficient to warrant reinstatement. See *In the Matter of Bennethum*, 278 Atl. 2d 831, 834 (Del. 1971); *Williams* v. *Governors of the Fla. Bar*, 173 So. 2d 686 (Fla. 1965). Cf. *Centracchio, petitioner*, 345 Mass. 342, 348 (1965). Length of time disbarred should not be treated as an additional penalty. The petitioner must demonstrate that his reinstatement would not be detrimental to the public welfare. In this regard, a long time span between disbarment and petition for reinstatement, during which the petitioner's conduct was exemplary, reinforces his claim to rehabilitation.

[20] In *Matter of Keenan*, 314 Mass. 544, 548, 549 (1943), we employed a more exacting standard: "To overcome it [the crime of

person proper to be held out by the court to the public as trustworthy" (footnote added). *Matter of Keenan,* 313 Mass. 186, 219 (1943). See *McArthur v. State Bar of Cal.* 28 Cal. 2d 779, 788 (1946). While the courts are slow to disbar, they are justifiably slower to reinstate and to "put into the hands of an unworthy petitioner that almost unlimited opportunity to inflict wrongs upon society possessed by a practicing lawyer." *In re Petition of Morrison,* 45 S. D. 123, 126 (1922). Accord, *In re Application of Smith,* 220 Minn. 197, 200 (1945).

In any disciplinary proceeding the findings and recommendations of the board, though not binding on this court, are entitled to great weight.[21] See *March v. Committee of Bar Examrs.* 67 Cal. 2d 718, 720 (1967); *In the Matter of Bennethum,* 278 Atl. 2d 831, 833 (Del. 1971); *Petition of Eddleman,* 77 Wash. 2d 42, 43 (1969). Cf. *In re Application of Strand,* 259 Minn. 379, 381 (1961). The board has heard testimony and observed witnesses and, by virtue of this firsthand observation, is better able than a reviewing court to judge the relative credibilities of witnesses and to assign weight to the evidence they give. In the instant case, the failure of Hiss to repent aside,[22] the board found (1) "that Mr. Hiss is presently of good moral character and that he would

---

'corruptly influencing three jurymen'] and to prove that the guilty person can again inspire the public confidence necessary to the proper performance of the duties of an attorney at law requires little less than absolute assurance of a complete change of moral character."

[21] In *Centracchio, petitioner,* 345 Mass. 342 (1963), we had before us a report of the Board of Bar Examiners, the board's predecessor in the position of oversight over disciplinary matters. We applied the standard for use of such reports which was prescribed in Rule 1 (7) of the General Rules (1952), 328 Mass. 732-733 (1952). "'At such hearing [before a single justice of this court] the report shall have the weight and effect of an auditor's report in an action of law.' This means 'prima facie evidence' G. L. (Ter. Ed.) c. 221, § 56." *Centracchio, petitioner, supra,* at 346.

[22] The board prefaced the first of these findings as follows: "Nevertheless, the Board, if it were free to consider the matter in the absence of the only evidence to the contrary (the conviction), would unani-

almost certainly not commit any serious crime if readmitted to the bar" and (2) "that the granting of the petition will clearly have no actual adverse effect upon the integrity of the Bar, as it would be evidenced by the conduct of any other attorney." These findings are supported by substantial evidence and warrant Hiss's reinstatement as a member of the bar. In the light of these findings, we believe that, absent the issue of repentance, the board would have recommended Hiss's reinstatement.

Considerable time (approximately twenty-three years) has elapsed since the original disbarment of Hiss. His activities since his disbarment reflect the efforts of a man who wished to abide by the court's decree of disbarment and to earn a living in other fields of endeavor while he maintained the scholarly interests he had held prior to his disbarment. In the interval between his disbarment and the present, he has scrupulously refrained from the practice of law. He has not been convicted of any crime[23] and has not been implicated in any activities which contained the slightest hint of dishonesty or moral turpitude. As the board found on ample evidence, "he has courageously and industriously set himself to earn an honest living and to support his family, without bewailing the financial loss caused by his conviction and disbarment."[24] He has pursued his scholarly interests through a program of diverse lectures and the publica-

---

mously find . . .." The context makes clear that the board referred to the conviction only in so far as the conviction compels reference to evidence of repentance and rehabilitation. We have previously dealt with the issue of repentance. We believe that the finding of present good moral character demonstrates rehabilitation.

[23] To be precise, he was once fined $5 for playing baseball with his son in Washington Square Park.

[24] Because of restrictions on his activities, his earnings over the years have been quite modest. Since 1966, Hiss's yearly earnings from his job as a salesman have not exceeded $14,100 and have averaged only about $10,400.

tion of articles and books. In his lectures, delivered at a wide variety of colleges, universities and other public forums, in this country and abroad, he has generally avoided the subject of his personal tribulations in order to concentrate on subjects relating to the United Nations and American foreign policy. He has written two books and has contributed a number of book reviews to periodicals. At the request of the late Professor Mark DeWolfe Howe of Harvard Law School, he edited the abridged edition of the Holmes-Laski letters.

The evidence regarding character supplied by Hiss's gainful employment in the business world is uniformly good. From 1956 to 1959, he was the assistant to the president of a small manufacturing concern, presumably a position of confidence. His employment was terminated by the financial difficulties suffered by his employer. After a brief period of unemployment, he obtained his current job as a salesman of stationery supplies and printing. The board found that "he has earned an excellent business reputation both for industry and honesty in this occupation." A representative of the company which employs Hiss testified that he had achieved a very close relationship with his customers and that they insisted that he alone service their accounts. She testified further that "[i]n the preparation of his billing"[25] he had "always been very, very fair and equitable and [had] never taken himself into consideration." Specifically, he had not availed himself of a bonus system through which he could have expanded his own commissions by charging a higher markup on sales. As additional proof of the high regard in which Hiss is held by his business colleagues there is in evidence a letter from the president of the corporation which is his employer's controlling stockholder. The president writes that in the event Hiss were to become a member of the

---

[25] The witness had worked with Hiss in the billing and credit aspects of the business.

Massachusetts bar, the firm "would be glad" to engage Hiss as a legal consultant to explore the legal requirements for doing business in Massachusetts.

At the hearing before the board, a number of talented and eminent attorneys came forward to attest to Hiss's good character.[26]   Others, including a retired Justice of the United States Supreme Court and a former Solicitor General of the United States, submitted complimentary affidavits and letters.[27]   We[28] have had to discount a part of this evidence because some of those giving evidence did not accept Hiss's guilt of the crime for which he had been disbarred and, thus, spoke of his good character without distinguishing the period before his conviction and disbarment from that which succeeded it.[29]   See *Matter of Keenan,* 314 Mass. 544, 550 (1943).

---

[26] No witnesses came forward to oppose reinstatement.   When duly notified, the Attorney General of the United States indicated that he did not "wish to be heard or to be represented at the hearing."   Similar communications were received from the Massachusetts Bar Association, the Committee on Grievances of the Association of the Bar of the City of New York and the clerk of the United States Supreme Court.   The prosecutor of the Hiss perjury case, the Honorable Thomas F. Murphy, did not respond to the communication of the board's counsel.

[27] Erwin N. Griswold (former Solicitor General of the United States and Dean of the Harvard Law School), Eli Whitney Debevoise, Benjamin V. Cohen, Charles A. Horsky and Joseph A. Fanelli submitted sworn affidavits recommending reinstatement.   Mr. Justice Stanley Reed submitted a letter to the same effect.

[28] The board did as well.

[29] As noted above, some of the witnesses based their recommendations for Hiss's reinstatement on the belief that Hiss was innocent.   It is true that the petitioner's record prior to the incident in question was outstanding and without blemish and that his life for the past two decades since his release from prison has been impeccable.   It is equally true that nothing in the record corroborates in any way the fact of guilt and, further, that the Department of Justice, although invited, has declined to appear in these proceedings.   Nonetheless, we emphasize that whether Hiss was innocent is not an issue in this matter and can receive no consideration.   The record of conviction must stand without question.

However, several witnesses provided solid evidence of fitness for reinstatement. Professor Victor Brudney of the Harvard Law School met Hiss after his release from prison and has had regular social contacts with Hiss throughout the years. In the course of their acquaintanceship, Professor Brudney testified, they have had numerous conversations on law and law-related subjects. In those conversations, Professor Brudney found Hiss to be quite competent ("a first-rate mind") in dealing with legal problems and aware of trends and events in the law. According to Professor Brudney, "the attitudes . . . [Hiss] revealed in discussion disclosed a perception and a sensitivity for the interests of others in controversial situations." Hiss was candid and direct in his dealings with people, and Professor Brudney said that he would "feel comfortable" if he received the first draft of a contract from Hiss if Hiss were acting for the other side. When asked if he would consult and confide in Hiss as a lawyer, Professor Brudney's response was enthusiastic and affirmative. Of a similar tenor was the testimony of Professor Richard Field, also of the Harvard Law School faculty. Professor Field, a noted scholar and pedagogue, currently teaches a course in "professional responsibility." His contacts with Hiss subsequent to the perjury convictions appear to have been less frequent than those of Professor Brudney, but were sufficiently numerous to provide ample basis for judgment. Professor Field testified that Hiss had retained his "deep interest" in the law and that, from their discussions, it was manifest that Hiss had "kept himself well abreast of developments" in the field of international law, his specialty. Professor Field stated further that he would have no hesitancy in employing Hiss as a legal consultant in the areas of Hiss's specialty.[30]

---

[30] The force of Professor Field's testimony is vitiated to an extent by his admission that he has never believed that Hiss was guilty of the crimes charged and that his opinion of Hiss's moral character was not changed by his conviction and disbarment.

The testimony of Helen Buttenwieser, a member of the New York bar and a good friend of Hiss, who on occasion has counseled Hiss on legal matters, also provides substantial support for the board's findings. According to her testimony, she has had frequent and fairly regular contacts with Hiss during the period subsequent to his disbarment. In the course of their relationship, both professional and social, she has found him to be a man of the "highest" integrity. She testified: "If he has a fault, it is that he tends to bend over backwards for fear he might possibly be trying to persuade somebody to do something which was beyond what he wanted to do." She testified further that she and one of her partners had often met with Hiss for lunch and that, during their luncheon conversations, they had had occasion to discuss legal cases of mutual interest. The discussions had ranged over questions of constitutional and civil liberties law and had accorded particular emphasis to issues from cases which her partner had pending before the United States Supreme Court. In these discussions, the witness had found Hiss both "capable" and "stimulating." Hiss has not, to her knowledge, shown any anger or rancor regarding the outcome of his trial. She testified: " [H]is attitude is that this is our system of justice and he will take his chances with it again and again and again."

Finally,[31] Hiss's own testimony must be mentioned in support of the board's finding of fitness. His testimony was both forthright and principled. He stated that he found the charge of perjury "abhorrent" and that the perjury charge had included "two other charges worse than perjury, which I regard as absolutely reprehensible in a lawyer — failure of trust and failure of confidence." He candidly gave his own impression of the development of his moral character, though that candid impression

---

[31] In the interests of brevity, we omit description of the supporting testimony of Mr. Robert Von Mehren of the New York bar and Mr. Richard Wait of this bar.

might have thwarted his reinstatement: "I have not had any complete change in moral character. I am the same person I have been, I believe, throughout my life. If that's the law of Massachusetts [requiring repentance and complete change of moral character], I am excluded." His testimony contained no hint of present animosity or grudge against those who had prosecuted and convicted him. The conviction itself had not shaken his faith in the judicial system: "[A]s far as the courts are concerned . . . I have never had the slightest doubt that ours is the finest judicial system there is, and I don't just mean in the Churchill sense . . . [i.e., that it's] better than any he knows about. It's good; it's fine. I think it makes mistakes, and I know it made a mistake in my case, but there is no human institution that doesn't sometimes make mistakes."

The testimony detailed above provides abundant support for the board's conclusion that Hiss is presently of good character. Though Hiss, himself, in holding fast to his contention of innocence, admits no rehabilitation of character, we believe that the evidence amply warrants the board's finding that he would not now commit the crime of which he was convicted. The considerable evidence of his present good character, his exemplary behavior over a substantial time span, and the tributes paid him by eminent practitioners who have known him well during the period convince us that, despite the gravity of the crime and his maturity at the time of its commission, "his resumption of the practice of law will not be detrimental to the integrity and standing of the bar, the administration of justice, or to the public interest." S.J.C. Rule 4:01, § 18 (4), 365 Mass. 696 (1974). It is notable in this regard that the record contains no testimony in opposition to reinstatement. Indeed, the Council of the Boston Bar Association, the organization which filed the information leading to disbarment, voted to communicate the opinion to the board that Hiss's resumption of practice would not adversely

affect the standing and integrity of the bar or the public interest.[32]   The board could correctly find that Hiss has sustained the heavy burden of showing moral and intellectual[33] fitness by good and sufficient proofs.

The petition for reinstatement to the bar is to be granted.   On subscription to the required oaths, Hiss is to be readmitted to the practice of law in the Commonwealth.

*So ordered.*

---

[32] In his letter, the president of the Boston Bar Association employed the language of S.J.C. Rule 4:01, § 18 (4), 365 Mass. 696 (1974), in so far as it is quoted in the paragraph hereinabove.

[33] As noted, many of the witnesses testified to his ability and continued attention to legal affairs.   Though his recollection of Massachusetts law will not be as "sharp" as it once was, we believe he has demonstrated a competence equivalent to that of an out-of-State lawyer admitted on motion or without examination (see G. L. c. 221, § 39).   In view of the finding of good moral character, we assume Hiss will have the sound discretion to restrict his consultative and advisory activities to areas of his undoubted competence.