664 A.2d 518

**In the Matter of Robert W. COSTIGAN.**

Supreme Court of Pennsylvania.

Argued April 26, 1995.

Decided Aug. 22, 1995.

John Rodgers Carroll, Philadelphia, for respondent.

Barbara S. Rosenberg, Philadelphia, for Disciplinary Board.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Petitioner Costigan was disbarred in December 1990 on account of a criminal conviction which concerned his mishandling of an estate. Now Costigan petitions this court for reinstatement pursuant to Pa.R.D.E. 218(c)(6). On June 29 and July 13, 1993 a hearing committee heard the matter, and on January 6, 1994 the committee filed its report, recommending that Costigan's petition be granted. Neither party took exceptions and on June 13, 1994 the Disciplinary Board also recommended reinstatement. On July 26, 1994, this court entered a rule to show cause why an order denying reinstatement should not be entered based on petitioner's failure to prove that his resumption of the practice of law would not be detrimental to the administration of justice.[1]

1. Pa.R.D.E. 218(c)(6) provides:

The sole issue in this case is whether Costigan has met his burden of establishing, by clear and convincing evidence that he:

has the moral qualifications, competency and learning in law required for admission to practice law in this Commonwealth and that [his] resumption of the practice of law within the Commonwealth ... will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest.

Pa.R.D.E. 218(c)(3)(i).

In *Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 506 A.2d 872 (1986), this court stated:

The primary purpose of our system of lawyer discipline is to protect the public from unfit attorneys and to maintain the integrity of the legal system.... In the case of disbarment there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time. When reinstatement is sought by the disbarred attorney, the threshold question must be whether the magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon "the integrity and standing of the bar or the administration of justice nor subversive of the public interest." Pa.R.D.E. 218(c)(3)(i)

509 Pa. at 579, 506 A.2d at 875.

The "breach of trust" in this case arose from Costigan's handling of an estate. *See Disciplinary Counsel v. Costigan*, 526 Pa. 16, 584 A.2d 296 (1990). As a result of his actions in handling the estate, Costigan was convicted of two counts of

In the event the Board recommends reinstatement and the Supreme Court, after consideration of that recommendation, is of the view that a rule to show cause should be served upon the respondent-attorney why an order denying reinstatement should not be entered, the same shall be issued setting forth the areas of the Court's concern. A copy of the rule shall be served on Disciplinary Counsel. Within 20 days after service of the rule, respondent-attorney, as well as Disciplinary Counsel, may submit to the Supreme Court a response thereto. Unless otherwise ordered, matters arising under this rule will be considered without oral argument.

theft by deception, two counts of theft by failure to make required disposition of funds received, two counts of theft, one count of criminal conspiracy, and one count of aiding in the consummation of crime. Numerous appeals were taken and denied and Costigan served a prison sentence from October of 1987 until October of 1989, and was on parole until October 9, 1992. Throughout, he has maintained that he is not guilty.

The facts underlying these convictions are that reputed drug dealer, loan shark, and mob figure Steven Booras was murdered on May 27, 1981.[2] Booras's two brothers and sister hired Costigan to represent the estate. The three told Costigan that the decedent has a son, Theodore, and that someone identifying himself as Theodore called the funeral home, but that Theodore had not been seen in many years.

On June 3, 1981, the Booras sister informed Costigan that her brother and co-administrator had removed at least $200,-000 in cash from the decedent's house in Philadelphia. She indicated that she had informed the FBI of this. Costigan suggested that the three administrators meet in his office the following day. On June 4, 1981 the meeting was conducted in Costigan's office. At that meeting, John Booras brought to Costigan's office a bag containing $270,000 in cash which he had removed from the decedent's house and a safety deposit box which was jointly held with the decedent. With the administrators present, Costigan drafted and then filed a petition for letters of administration, naming the three siblings as co-administrators. The petition disclosed that the decedent had a son, Theodore, but that he had not been seen in some time and might be deceased. Costigan listed the value of the estate at $50,000. After the petition was filed, the four returned to Costigan's office and the three siblings divided up the $270,000 which was in the bag. Costigan received $10,000 cash, which he characterized as a retainer. Three weeks later, Costigan had still not entered the $10,000 cash payment in his ledger. The next day, the three appeared in Costigan's office with two cases of coins and bills of numismatic value and

2. The decedent was the reputed head of the so-called Greek mafia.

jewelry which was subsequently appraised at $27,000 and divided among the siblings.

On June 9th and again on June 12th, 1981 an attorney for the decedent's son, Theodore, called Costigan and informed him that Theodore was alive. During conversations with Theodore's attorney in which Costigan detailed the assets of the estate, Costigan failed to reveal the distribution of cash and jewelry. Costigan explained that he did not inform the other attorney of the distribution of cash and jewelry because of attorney-client confidentiality.

In the disciplinary case resulting in Costigan's disbarment, this court stated:

> As the Board concluded, the actions which resulted in Costigan's criminal convictions reflect wrongdoing and a serious lack of judgment. At the very *least*, Costigan allowed himself to be manipulated by his clients into commission of unethical and criminal acts. While it does not appear that he fostered all of the outrageous conduct of the Booras family, he cannot be absolved of his participation in it. The convictions demonstrate that Costigan participated in an unorthodox distribution of estate assets involving concealment of assets from the rightful heir.

526 Pa. at 24, 584 A.2d at 300.

Since his release from prison, Costigan has been employed in a law firm as a paralegal. Witnesses testified that his work is exemplary.

As was stated in the *Keller* case, our threshold question is whether the magnitude of the breach of trust permits the resumption of the practice of law without a detrimental effect upon the integrity and standing of the bar, the administration of justice, or the public interest. Further, as *Keller* made clear, when an attorney is disbarred "there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time." 509 Pa. at 579, 506 A.2d at 875. Pursuant to the requirements of *Keller*, then, we must consider first the nature of Costigan's misconduct. If that misconduct is not so extreme as to bar

readmission in itself, we must then consider whether the petitioner has met his burden of establishing that he presently meets the requirements of Pa.R.D.E. 218(c)(3)(i), i.e., that the resumption of his practice of law will not be detrimental to the bar, the administration of justice or the public interest. If the petitioner has met this burden, this court may grant the petition.

■ Inevitably, meeting the requirements of rule 218(c)(3)(i) will involve the petitioner's coming to terms with the conduct which caused his disbarment. In other words, the petitioner must demonstrate not only that he understands the nature of his wrongdoing, but also he must convince this court that he is not predisposed to commit future ethical infractions.

■ We agree with the Office of Disciplinary Counsel and Costigan that his misconduct does not in itself bar consideration of his petition. We must address, therefore, whether Costigan has met his burden of establishing that he presently meets the requirements of Pa.D.R.E. 218(c)(3)(i). When asked about his convictions on cross examination, Costigan replied as follows:

Q. And the conclusion that you have drawn from all of these proceedings is that if you were to be reinstated to the practice of law, you would have to do better to protect yourself from your own clients, am I understanding that correctly?

A. That's certainly true, yes.

Q. Do you agree or disagree with this statement: "That the actions which resulted in Costigan's criminal convictions reflect wrongdoing and a serious lack of judgment"?

A. I think they reflect—they reflect—yeah, they do reflect both wrongdoing and a serious lack of judgment. But the wrongdoing wasn't on my part.

Q. So.

A. The lack of judgment was mine.

Q. So the actions that are referred to that reflect wrongdoing are not your actions? They are other people's actions?

A. That is correct.

\* \* \* \* \* \*

Q. And it's your conclusion today that the best way for you to avoid any further involvement in the criminal justice system or any further charges against you is to act to protect yourself from your clients such as by covertly taping conversations you have with them, is that . . .

A. No. I . . .

Q. Is that your testimony today?

A. No, that is not my testimony today. I didn't do it then I wouldn't do it now.

Q. So if you said earlier that you . . .

A. No, what I said earlier was that if I had known that these conversations were going to become so significant, yeah, I would have taped them, but I did not know and you're not ever going to know in advance. And I don't intend to start practicing taping people's conversations.

Q. But you do intend primarily to avoid such situations in the future?

A. Absolutely.

Q. To act in a way that would protect yourself from your clients? Because it's really the clients that caused this kind of problem; is that correct?

A. Well, in my case it happened to be. I think the proof of it, proof of the pudding is that the woman who was the star witness against me was the only one who walked away with any money.

It is fair to say that Costigan's view is that he was innocent of wrongdoing and that if there was any wrongdoing, it was on the part of his clients.

█ Costigan also asserts that even though he was convicted of various crimes in connection with his handling of the Booras estate, he is not guilty of criminal conduct in that case and he should not be compelled to confess to a crime he did not commit as a condition for reinstatement to the bar of

Pennsylvania. The Supreme Judicial Court of Massachusetts, addressing a similar claim, stated:

> The continued assertion of innocence in the face of prior conviction does not, as might be argued, constitute conclusive proof of lack of the necessary moral character to merit reinstatement. Though we deem prior judgments dispositive of all factual issues and deny attorneys subject to disciplinary proceedings the right to relitigate issues of guilt, we recognize that a convicted person may on sincere reasoning believe himself to be innocent.
>
> \* \* \* \* \* \*
>
> For [the convicted attorney], a rule requiring admission of guilt and repentance creates a cruel quandary: he may stand mute and lose his opportunity; or he may cast aside his hard-retained scruples and, paradoxically, commit what he regards as perjury to prove his worthiness to practice law.... Honest men would suffer permanent disbarment under such a rule. Others, less sure of their moral positions, would be tempted to commit perjury by admitting to a nonexistent offense (or to an offense they believe is nonexistent) to secure reinstatement.

*In re Hiss,* 368 Mass. 447, 333 N.E.2d 429, 436–37 (1975). We agree with the Massachusetts court that no person applying for reinstatement to the bar after disbarment should be compelled as a condition of reinstatement to confess to crimes that he does not believe he committed.

Our focus here is not on Costigan's criminal convictions, however, but on the legal and ethical significance of uncontested facts which emerged in the criminal case.

Those facts include the following: Costigan prepared and subsequently filed documents listing the value of the estate at $50,000 as he sat in the same room with a bag containing $270,000 in cash belonging to the estate. He allowed the administrators of the estate to divide up $270,000 in cash and take this money into their possession rather than insisting that the cash be deposited in a bank account. He accepted $10,000 cash himself and then failed to enter this payment in his

ledger. When he communicated with the attorney representing the deceased's son and heir, detailing the assets of the estate, he failed to disclose that those whom he had appointed as co-administrators had divided among them $270,000 belonging to the estate.[3] It may be fairly said that any one of these factors, standing alone, would not raise the specter of impropriety, but when they are taken together, the inescapable inference is that Costigan and the administrators intended to appropriate significant sums of money belonging to the estate for their own use without accounting to anyone except each other for the misappropriated money. Moreover, even if this was not Costigan's intent, he handled the case in such a way as to raise the inference that it was his intent, and thus, he gave the appearance of wrongdoing, which cast doubt on the integrity of the bar.

The question before us is whether, on these facts, the applicant has met his burden of demonstrating by clear and convincing evidence that he has appropriate moral qualifications, competency and learning in law, and that he is, in a word, trustworthy. Pa.R.D.E. 218(c)(3)(i).

Nearly fifteen years ago, this court quoted from the Maryland Court of Appeals' decision affirming the disbarment of former Vice President Spiro Agnew:

Few vocations offer as great a spectrum for good and honorable works as does the legal profession. The attorney

---

**3.** In the criminal trial, the trial court writes:

Defendant Costigan explained, painstakingly if unconvincingly, that he had not entered the $10,000 "fee" in his ledger and had kept the cash in his desk drawer for three weeks because he had anticipated that due to the conflicts between his clients, he would be removed from the case. His failure to divulge the distribution among the siblings to Terrill [the son's attorney] was explained on the basis of attorney-client confidentiality and that he had no obligation to account to an attorney professing to represent the heir. The understatement of the value of the estate in the application for letters of administration was explained as being the customary practice. He acknowledged that his handling of the estate was unorthodox and that his actions might have been misleading, but insisted that his motivations were noble.

*Commonwealth v. Costigan,* Bill Nos. 4908–4915 March Term 1982 (Common Pleas, First Judicial District), filed January 25, 1985.

is entrusted with the life savings and investments of his clients. He becomes the guardian of the mentally deficient, and potential savior for the accused. He is a fiduciary, a confidant, an advisor, and an advocate. However, the great privilege of serving in all these capacities does not come without the concomitant responsibilities of trust, candor and honesty. In fact, it can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest. Consequently, an attorney's character must remain beyond reproach.

*Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 528, 426 A.2d 1138, 1142 (1981), citing *Maryland State Bar Association v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974).

We agree with the Maryland Court that "trust, candor and honesty" are the fulcrum on which the scales of justice rest. In Costigan's case, if he had acted in accord with such ideals at the time of handling the estate, he would not have been disbarred, and if he had demonstrated an understanding of their importance in the present proceeding, he would likely be reinstated, for such an understanding would probably qualify him under Pa.R.D.E. 218(c)(3)(i). Unfortunately, we do not believe that Costigan has any greater understanding of his responsibilities as an attorney for "trust, candor and honesty," than he did at the time of his disbarment. He finds nothing wrong with his actions in the estate matter, and instead blames his clients for any wrongdoing. This failure to acknowledge his own wrongdoing disqualifies him from readmission to the bar under the terms of Pa.R.D.E. 218(c)(3)(i): he does not possess a basic understanding of legal ethics (competency);[4] his readmission would be detrimental to the integrity and standing of the bar; and his readmission would be subversive of the public interest.

The petition for reinstatement is denied and the rule to show cause is made absolute.

---

4. Pa.Rule Prof Conduct 8.4(c) prohibits conduct involving dishonesty, fraud, deceit, or misrepresentation; Pa.Rule Prof Conduct 8.4(d) prohibits conduct that is prejudicial to the administration of justice.

470

CAPPY, J., concurs in the result.

MONTEMURO, J., sitting by designation, files a dissenting opinion.

MONTEMURO, Justice, dissenting.

I disagree with the majority's analysis of this case. It is beyond dispute that Robert Costigan ("Costigan") was disbarred by this Court, *see Disciplinary Counsel v. Costigan,* 526 Pa. 16, 584 A.2d 296 (1990), based upon certain criminal convictions which resulted from his participation in the administration of an estate.[1] The disbarment was ordered on December 26, 1990 and made retroactive to the date of suspension, July 13, 1984.

Costigan is now seeking reinstatement.[2] Consistently, from the initiation of the criminal charges, throughout conviction, numerous appeals and the subsequent disciplinary proceedings, Costigan has denied criminal culpability, admitting only that his actions constituted a serious lack of judgment. The Office of Disciplinary Counsel argues that Costigan's continued refusal to accept responsibility for his conviction, vis-a-vis, to admit wrongdoing, would have a detrimental effect on the administration of justice, and therefore, precludes reinstatement.

Referring to a similar Massachusetts case, *In re Hiss,* 368 Mass. 447, 333 N.E.2d 429 (1975), the majority agrees with the Massachusetts court's analysis that "a rule requiring admis-

1. Costigan was found guilty of two counts of theft by deception, two counts of theft by failure to make required disposition of funds received, two counts of theft, one count of criminal conspiracy, and one count of aiding in the consummation of crime.

2. Pa.R.D.E. 218 [Reinstatement] provides that after a petition for reinstatement is filed with the Disciplinary Board of the Supreme Court, the petition is scheduled for a hearing, at which the petitioner

shall have the burden of demonstrating by clear and convincing evidence that such person has the moral qualifications, competency and learning in the law required for admission to practice law in this Commonwealth and that the resumption of the practice of law within the Commonwealth by such person will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest.
Pa.R.D.E. 218(c)(3)(i).

sion of guilt and repentance creates a cruel quandary: [the convicted attorney who believes himself to be innocent] may stand mute and lose his opportunity [for reinstatement]; or he may cast aside his hard-retained scruples and, paradoxically, commit what he regards as perjury to prove his worthiness to practice law...." *Id.* 333 N.E.2d at 437. As such, the majority concludes that admission of guilt cannot serve as a condition or prerequisite to reinstatement.

Having made that determination, the majority proceeds to recount the facts of Costigan's criminal conviction and then questions whether on the basis of those facts, the applicant has met his burden of establishing his moral qualifications, competency and learning in the law as required by Pa.R.D.E. 218(c)(3)(i). The majority concludes that he has not, particularly because "[h]e finds nothing wrong with his actions in the estate matter, and instead blames his clients for any wrongdoing. This failure to acknowledge his own wrongdoing disqualifies him from readmission...." With the same breath, therefore, the majority determines that admission of guilt is not required for reinstatement, but denies Costigan's petition, nonetheless, because of his failure to admit wrongdoing. I believe that the majority's conclusions are inconsistent.

In *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986), we addressed the requirements necessary to seek reinstatement. As the majority correctly notes, *Keller* requires us to first examine the nature of the conduct which resulted in disbarment in order to determine if the conduct was itself so egregious that it would forever bar readmission. If not, we must then proceed to consider whether the petitioner has sufficiently carried the burden of proof to establish his fitness to practice law as required by Pa.R.D.E. 218(c)(3)(i).

Addressing that two-prong test, I agree with the majority that the misconduct which initially resulted in Costigan's disbarment does not automatically act to bar consideration of his petition for reinstatement. The majority's analysis of the second prong is with what I disagree.

Our Rule, Pa.R.D.E. 218(c)(3)(i), clearly requires the petitioner to establish by clear and convincing evidence that he is fit to resume the practice of law and that he has sufficiently rehabilitated so that if the privilege is once again bestowed upon him, his resumption of practice will not be detrimental to the integrity of the bar nor to the administration of justice. In making that determination, the majority focuses on the facts which led to disbarment and Costigan's continued denial of criminal culpability, whereas, I believe it is necessary to review all of the evidence presented to the Board.

While I recognize that we are not bound by the findings of the Disciplinary Board, *see Office of Disciplinary Counsel v. Zdrok,* 538 Pa. 41, 44–45, 645 A.2d 830, 832 (1994), I note that we often defer to those findings and recommendations. *Id.* Indeed, it is the evidence which was presented to the Board which will guide us in determining if Costigan has carried his burden.

Such evidence, as found by the Board, did, of course, include the facts and circumstances of Costigan's disbarment. However, the evidence also included testimony from ten witnesses, all of whom testified to Costigan's reputation for honesty and integrity within the legal community. (Report and Recommendations of the Disciplinary Board at 3–4). Moreover, Costigan testified that in addition to working as a paralegal in the law offices of Michael Stack, Esquire, he also made an effort to keep abreast of the latest developments in the law by reading the advance sheets and *The Legal Intelligencer.* In fact, the Office of Disciplinary Counsel does not dispute that Costigan is sufficiently learned in the law to resume practice. (N.T. 7/13/93 at 92).

Furthermore, my thorough review of the record reveals, and perhaps, most importantly, that Costigan has attended various continuing legal education seminars, including two lectures on legal ethics, (N.T. 7/13/93 at 51), and that these seminars have helped him gain a better understanding of his ethical responsibilities. (N.T. 7/13/93 at 74). Specifically, I believe that the following exchange is particularly instructive:

Q: Has this experience led you to have gotten for yourself any self-protective attitudes or practices that you will employ if readmitted in the practice of law?

A: Oh, I think absolutely. Absolutely.

Q: Can you expand on that?

A: Well, it's very difficult to pick a particular situation, because I don't know what will occur, but I do know—I think the tenure of the times is different, too. Back ten years ago, the lawyer was primarily obligated to protect his client. And I think, having attended some of the ethic seminars, that that's not quite as true today as it was then.

I think that the—the lawyer today has enunciated, at least in these seminars, is—has a greater duty to the court or to society in general then just to his client. I think—I think that that has been a change that has occurred not only just with me. I think that's the way the system is evolving.

(N.T. 7/13/93 at 50–51). Costigan also testified that his actions which resulted in the criminal convictions reflected a serious lack of judgment on his part (N.T. 7/13/93 at 67) and that from the experience that he has been through, his perception of lawyers' obligations has changed. (N.T. 7/13/93 at 73–74).

After hearing all of the evidence, the Board recommended that reinstatement was appropriate. In so concluding, the Board noted that "all of [Costigan's] witnesses testified that reinstating [Costigan] into the bar would not harm the standing, reputation or integrity of it, and that several emphasized that they would welcome his return." (Report and Recommendations of the Disciplinary Board at 11).

In another reinstatement case, we described the reinstatement process as follows:

A reinstatement proceeding is a searching inquiry into a lawyer's present professional and moral fitness to resume the practice of law. The object of concern is not solely the transgressions which gave rise to the lawyer's suspension or disbarment, but rather, the nature and extent of the rehabil-

itative efforts he has made since the time the sanctions were imposed, and the degree of success achieved in the rehabilitative process.

*Philadelphia Newspapers, Inc. v. Disciplinary Board of the Supreme Court,* 468 Pa. 382, 385–386, 363 A.2d 779, 780–781 (1976) (footnote omitted).

Consequently, I believe that Costigan established by clear and convincing evidence that he is fit to resume the practice of law and that his resumption would not be detrimental to the administration of justice. Therefore, I dissent and would accept the Board's recommendation for reinstatement.