**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| IN THE MATTER OF: ANTHONY C. CAPPUCCIO | : | No. 1493 DD3 |
| | : | |
| | : | No. 79 DB 2009 |
| | : | |
| | : | Attorney Registration No. 89512 |
| | : | |
| | : | (Bucks County) |
| | : | |
| | : | SUBMITTED:  December 23, 2024 |

**OPINION**

**JUSTICE MUNDY**                                              **DECIDED:  JULY 2, 2025**

The issues in this disciplinary case are whether Anthony Cappuccio, who was disbarred in 2012, retroactive to July 30, 2009, satisfied the threshold reinstatement standard under *Office of Disciplinary Counsel v. Keller*, 506 A.2d 872 (Pa. 1986),[1] and, if so, whether he has met the criteria for reinstatement under Pa.R.D.E. 218(c)(3).[2]  *See*

---

[1] In *Keller*, this Court explained that "[w]hen reinstatement is sought by the disbarred attorney, the thres[]hold question must be whether the magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon the integrity and standing of the bar or the administration of justice nor subversive of the public interest." *Keller*, 506 A.2d at 875 (citation and internal quotation marks omitted).

[2] Rule 218(c)(3) provides, in relevant part, that a disbarred attorney

> shall have the burden of demonstrating by clear and convincing evidence that such person has the moral qualifications, competency and learning in law required for admission to practice law in this Commonwealth and that the resumption of the practice of law within the Commonwealth by such person will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest."

(continued…)

*Per Curiam* Order, 9/11/24.  Upon our *de novo* review of this matter, we determine that Cappuccio is entitled to reinstatement.

## I. FACTS AND PROCEDURAL HISTORY

This Court previously summarized the relevant background underlying this matter as follows:

> [Cappuccio] was admitted to practice law in 2002. [Cappuccio] was hired as a Deputy District Attorney for Bucks County following graduation from law school and was promoted to Chief Deputy District Attorney in 2007.  He also served as Chief of the Grand Jury unit and Chief of the Homicide by Vehicle unit.
>
> From about January 2005 until June 2008, [Cappuccio] served as a "Youth Fellowship Group Leader" for a Methodist Church in Perkasie, Pennsylvania.  On several occasions from March 2007 through July 2008, he supervised [a group of boys] under the age of 18 from the church youth group and accompanied them to rock concerts.  At these concerts[, Cappuccio] purchased and supplied alcoholic beverages to three minors and also smoked marijuana with them.  During this same period[, Cappuccio] also attended football games, played pool and went to restaurants accompanied by members of the youth group.  The minors were permitted to attend the concerts and remain out late because the parents trusted [Cappuccio] in light of his position as a church youth group leader and as a Chief Deputy District Attorney.
>
> From May through September of 2008, [Cappuccio] engaged in a consensual sexual relationship with [one of the boys, then-16 years old (hereinafter referred to as "victim # 1")]. The physical relationship began with kissing and eventually escalated to mutual oral sex.  The incidents occurred on approximately twelve separate occasions and took place in various public parking lots, the victim's home, and [Cappuccio's] home. During this time[, Cappuccio] told victim # 1 not to reveal the relationship to anyone due to the victim's age and [Cappuccio's] marriage.  The relationship was consensual and the victim was over the legal age of consent relating to sexual offenses as defined by 18 Pa.C.S. § 3101, *et seq. See, e.g.,* 18 Pa.C.S. § 3122.1 (defining statutory sexual assault upon person under sixteen years of age).

---

Pa.R.D.E. 218(c)(3).

… [Cappuccio] was confronted by his wife about his relationship with victim # 1. Nevertheless, he continued to engage in the sexual liaison with victim # 1 for several more months.

A criminal investigation was instituted against [Cappuccio] on September 5, 2008, after [Cappuccio] and victim # 1 were discovered by a police officer partially clothed in an automobile parked in a public shopping center. [Cappuccio] resigned from his position at the Bucks County District Attorney's office the next day.[3] On September 15, 2008, [Cappuccio] engaged in another sexual encounter with victim # 1 at [Cappuccio's] home. [Cappuccio] has had no further contact with victim # 1.

As a result of the investigation, a criminal information was filed against [Cappuccio]. On March 10, 2009, [Cappuccio] entered a guilty plea to three counts of endangering the welfare of children, 18 Pa.C.S. § 430[4](a)(1), one count of criminal use of a communication facility, 18 Pa.C.S. § 7512(a), three counts of corruption of minors, 18 Pa.C.S. § 6301(a)(1), and three counts of furnishing liquor or malt or brewed beverages to minors, 18 Pa.C.S. § 6310.1(a). The endangering children and criminal use of a communication facility are offenses classified as felonies of the third degree.

The trial court initially sentenced [Cappuccio] to house arrest for a period of six to twenty-three months, followed by probation. However, [Cappuccio] was re-sentenced to six to twenty-three months in a Bucks County Criminal Facility for the endangering children conviction, five years' probation for the criminal use of a communication facility, two years' probation consecutive to the prior counts for the corruption of minors, and no further penalty for furnishing liquor. [Cappuccio] served his incarceration at Northampton County Prison and was released to house arrest on October 15, 2009. [Cappuccio was released from supervision on February 10, 2018.]

Following [Cappuccio's] conviction and sentencing, this Court entered an order on July 30, 2009, placing [Cappuccio] on temporary suspension …, and referring the matter to the [Disciplinary Board of the Supreme Court of Pennsylvania (hereinafter, "Board")] for further proceedings. The [Office of Disciplinary Conduct ("ODC")] then filed a Petition for Discipline, charging [Cappuccio] with

---

[3] Following his resignation from the District Attorney's office and through his disbarment, Cappuccio held multiple jobs in the restaurant industry, "at one point simultaneously working at three jobs to support himself and his two minor children." Board's Report and Recommendations, 5/15/24, at ¶ 70. From 2010 to present, Cappuccio has worked as a paralegal and most recently, since 2018, has been employed full-time in this capacity at Bruno Law. *Id.* at ¶ 71, 76.

professional misconduct arising from his criminal convictions. A disciplinary hearing was held before a Hearing Committee appointed by the Board on December 11, 2009. During those hearings, the ODC presented evidence of [Cappuccio's] conviction as well as the fact that his criminal conduct was publicized to the community on electronic media and in newspaper articles.

[Cappuccio] presented the testimony of Dean Dickson, a licensed psychologist with a private practice. Mr. Dickson treated [Cappuccio] following his arrest and until his incarceration. Sessions resumed by telephone following [Cappuccio's] release from prison and [Cappuccio] resumed in-person sessions after he was released from house arrest. Mr. Dickson stated that [Cappuccio's] risk of recidivism was low and expressed the opinion that [Cappuccio] does not suffer from a psychological or personality disorder or any sexual deviance. He further opined that [Cappuccio's] criminal conduct was due, in part, to his sexual identity problems; however, he acknowledged that [Cappuccio] had the ability to choose right from wrong and noted that homosexuality is not a psychological disorder.

[Cappuccio] was also evaluated by Don Seraydarian, Ph.D., who performed psychological testing. Dr. Seraydarian's testimony was consistent with that of Mr. Dickson. He also opined that [Cappuccio] suffered from an adjustment disorder with mixed disturbance of emotion and conduct and sexual identity problems. Dr. Seraydarian added that acceptance of his sexual identity created emotional problems for [Cappuccio]. In addition to the experts' testimony, [Cappuccio] testified on his own behalf, expressing remorse and taking full responsibility for his misconduct. He also offered the testimony of William McElroy, Esquire, who described [Cappuccio] as an excellent and competent attorney. Mr. McElroy also opined that [Cappuccio] had a reputation in the community as a truthful and honest person. John Benson, Esquire, also testified on [Cappuccio's] behalf. Mr. Benson had previously worked with [Cappuccio] at the District Attorney's office and described [Cappuccio's] trial skills as excellent. Mr. Benson further opined that [Cappuccio] had an excellent reputation in the community as peaceful, law-abiding, truthful and honest. Finally, [Cappuccio] presented the collective testimony of fifteen family members and friends, who supported him and testified to his excellent reputation in the community as a peaceful and law-abiding person.

The Hearing Committee recommended disbarment, finding that there were four aggravating circumstances and eight mitigating circumstances present in this matter. The four aggravating circumstances noted were that [Cappuccio] held a public office at the time of the misconduct, the public notoriety surrounding the misconduct, his inappropriate post-crime conduct, and the nature and duration of the crime. The eight mitigating circumstances considered were [Cappuccio's] lack of

disciplinary history, his positive academic history, the positive character witnesses, his cooperation in the disciplinary proceedings, his remorse for the misconduct, his continued psychological treatment, the payment of complete restitution, and the low risk of recidivism. The Hearing Committee also noted that [Cappuccio's] expert testimony did not meet the standard for mitigating evidence under *ODC v. Braun,* [553 A.2d 894 (Pa. 1989)]. In *Braun*, this Court held that a psychological disorder will be considered a mitigating factor where it caused the misconduct. In this case, the Hearing Committee concluded that [Cappuccio] could not meet the *Braun* standard because of the lack of a specific psychological disorder diagnosis. The Hearing Committee recommended disbarment due to the fact that [Cappuccio] would be under sentence for longer than the five-year maximum suspension. "It would be both inappropriate and in contravention of past disciplinary proceedings to allow [Cappuccio] to practice before the courts of Pennsylvania while he remains under sentence."

[Cappuccio] filed a Brief on Exceptions and requested oral argument before the Board. Following oral argument, the Board recommended a five-year suspension, citing similar matters where attorneys have engaged in sexual misconduct and furnished alcohol to minors and have been suspended for a period of five years. … The matter then proceeded to this Court where … we issued a rule respecting disbarment and then entertained oral argument.

*Office of Disciplinary Counsel v. Cappuccio,* 48 A.3d 1231, 1233–36 (Pa. 2012) ("*Cappuccio I*") (citation and footnote omitted).

Ultimately, in *Cappuccio I*, we held that Cappuccio's misconduct warranted disbarment rather than a five-year suspension. *See id.* at 1242 (explaining that "[o]ur final order disbarring [Cappuccio took] into consideration all of the circumstances surrounding the misconduct, the good and the bad, as well as the unique public posture of [Cappuccio] at the time he committed the misconduct"). *See also id.* at 1240 (finding "the fact that a lawyer holds a public office, or serves in a public capacity, as here, is a factor that properly may be viewed as aggravating the misconduct[,]" and is especially so in cases, like the instant matter, "where the public position is that of prosecutor and the misconduct involves criminal actions").

This matter saw no further action until late-2016, when Cappuccio filed a Petition for Reinstatement. A two-day hearing was held in early 2017, at which time Cappuccio

presented the testimony of 17 witnesses, in addition to entering several exhibits into evidence and testifying on his own behalf. Cappuccio also stipulated to the testimony of an ODC witness, and several exhibits introduced by the ODC were admitted without objection.

Together, Cappuccio's witnesses testified that he: (1) was compliant with all of his probationary requirements, *see* N.T. 1/13/17, at 46-47; (2) has undergone psychological treatment and has participated in both individual and group therapy sessions, *see* N.T. 3/6/17, at 43-44; (3) successfully completed all aspects of the treatment program, *see id.* at 44; (4) was never diagnosed with pedophilia or any sexual disorder of that nature, *id.* at 45; (5) has taken full responsibility for his actions and has used his time in treatment to help other offenders, *id.* at 47-51; N.T., 1/13/17, at 84, 109-153; 169-171; (6) is a competent employee who never held himself out as an attorney during post-disbarment employment, *id.* at 80-84, 108; 167-68; and (7) has a reputation for being a truthful, honest, law-abiding person,[4] *id.* at 82, 109-132, 170-171.

The ODC presented the stipulated testimony of Attorney Michelle Henry, who was the acting Bucks County District Attorney at the time Cappuccio engaged in, and was arrested for, his misconduct. The parties stipulated that Attorney Henry would testify that she and her colleagues were shocked when Cappuccio, described as one of the "excellent, young attorneys" in the office, was arrested, and that his conduct brought "great disgrace" upon the office. *See* N.T., 3/6/17, at 86-88. She would have also expressed that Cappuccio's actions hurt the office "in the eyes of the public and in terms of the integrity of the office." *Id.* at 88.

---

[4] With respect to his reputation, Cappuccio presented testimony, by stipulation, of several family members. N.T. 1/13/17, at 185-190.

Following the submission of post-hearing briefs, the Hearing Committee filed a report, concluding, based significantly on the relatively short period of time that had elapsed since disbarment was first ordered, that Cappuccio failed to meet his burden for reinstatement and recommended that the petition be denied. *See* Findings of Fact of the Hearing Committee, 8/8/17, at 12 ("Less than eight years of disbarment is insufficient time to dissipate the detrimental impact [Cappuccio's] egregious misconduct had on the public trust."). *See also id.* ("Separate and apart from clear and convincing evidence that a readmission will not be detrimental to the integrity of the bar nor damaging to public trust, [Cappuccio] himself has done everything within his power to show that he has the personal character, fitness[,] and technical competence to re-enter the practice of law at some point in the future.") Contesting this determination, Cappuccio filed a brief on exceptions and, on October 4, 2017, the Board (hereinafter, "2017 Board") heard oral argument.

In its subsequent recommendation, the 2017 Board opined that the "conduct for which [Cappuccio] was disbarred is not so egregious as to preclude consideration of his [p]etition[.]" 2017 Board's Report and Recommendation, 11/27/17, at 18 (citing *Keller*, *supra*). *See also id.* at 20 and *id.* at n.1 (observing that the ODC was not challenging whether Cappuccio satisfied the *Keller* standard and while "[t]here is no doubt that [Cappuccio's] misconduct was egregious and that disbarment was the appropriate sanction[,] … consistent with case law, we conclude that [Cappuccio's] misconduct was not so egregious that it should prohibit his reinstatement"). The 2017 Board went on to explain that while Cappuccio had demonstrated that he had been rehabilitated, it was in unanimous agreement that the petition should be denied, as "the magnitude of his criminal acts, … was so great that [ ]reinstatement at [that] time[] would be detrimental to

the integrity and standing of the bar and the administration of justice, and would subvert the public interest." *Id.* at 28.

Prior to our review of the 2017 Board's recommendation, Cappuccio submitted a letter, advising this Court that he accepted the Board's decision. Also in his letter, Cappuccio indicated his understanding that the 2017 Board believed it was too soon to reinstate him due to "its effect on public opinion" and thus, he would "allow a few more years to pass" before again seeking restatement. *See* Answer, 11/30/17, at 1. Upon receiving this submission, this Court entered a *per curiam* order denying reinstatement. *See Per Curiam* Order, 1/22/18.

On June 9, 2022, Cappuccio filed the at-issue reinstatement petition, his second, and a hearing was subsequently held over the course of two days in April 2023. At that time, Cappuccio and the ODC entered into a joint stipulation, admitting into evidence the entire record from the 2016 reinstatement hearing. The stipulation also identified various witnesses who testified in the first reinstatement proceeding, as well as a notation that the parties agreed that recalling these witnesses would not be necessary, as their testimony remained unchanged. Board's Report and Recommendations, 5/15/24, at ¶ 53.

During the hearing, Cappuccio presented a letter from Dr. Veronique Valliere, his treating psychologist, in addition to testimony from several other witnesses who provided insight concerning Cappuccio's activities since his 2016 petition.[5] In the letter, Dr. Valliere

---

[5] Dr. Valliere runs Forensic Treatment Services. Cappuccio was treated through Dr. Valliere's program from November 2010 through September 2013 when he successfully completed the program. She provided testimony at the first reinstatement hearing. At that time, she explained that Cappuccio was initially "very arrogant and fairly dismissive," but over a four-year treatment time, as he participated and confronted his issues, his behavior and demeanor changed. N.T., 3/6/17, at 42. As part of these same proceedings, Dr. Valliere submitted a letter in which she, *inter alia*, stated that she did not have any concerns about supporting Cappuccio's attempts to regain his law license. *See* Valliere Letter, 8/22/16.

explained that she had interviewed Cappuccio several days earlier and found that he maintained the "significant gains he made during his treatment." Valliere Letter, 12/20/22, at 1. She also indicated that, based on the information she was provided, she did not have concerns of Cappuccio "committing any type of criminal offense." *Id.* at 2.

Cappuccio also testified on his own behalf. He relayed that he has two teen-aged children and that he and his former wife have a good relationship, talking regularly and communicating multiple times during the week about their sons. N.T., 4/3/23, at 222-27. Cappuccio testified to engaging in community service activities with his children and detailed his treatment with Dr. Valliere. *See id.* at 234-37, 264-68. *See also* N.T., 4/12/23, at 86, 93 (explaining that his misconduct came from his "selfishness, sense of entitlement[, ] a desire to maintain certain images and taking advantage of an opportunity[,]" and through treatment, he became "more self-aware, developing more empathy").

Cappuccio also stated that he agreed disbarment was the appropriate discipline, *see id.* at 98, and spoke at length about the 2016 reinstatement proceedings and his decision to accept the Board's recommendation. *See id.* at 104 ("[O]nce the Board said no reinstatement … it was my decision not to petition to [this Court]. That was against the advice of counsel. And I said, 'No, I think – I'm hearing the Board say I need more time, more time needs to pass. I'm going to let it go and let it breathe. Because they know far more than I do about where my case falls on the spectrum of cases, disbarment and reinstatement. They're the experts, not me, and I need to listen to that.'"). Cappuccio further testified about his most recent bid for reinstatement, expressing his desire to resume the practice of law to help others and insisting that he was better prepared to handle the responsibilities of being a lawyer now than he was before. *Id.* at 105-11.

In addition to the foregoing testimony, several members of the bar testified favorably on Cappuccio's behalf. Collectively, they described Cappuccio as: (1) open and honest about the misconduct that led to his disbarment, *see* N.T., 4/3/23, at 50; (2) an exemplary employee, *id.* at 52-53, 99-101; (3) never holding himself out as attorney or providing legal advice while working in the capacity of a paralegal, *see id.* at 161-162; and (4) having a reputation for being professional, truthful, honest, and law-abiding, *see id.* at 63; 167-168.[6] Each of these attorneys also express their support for Cappuccio's reinstatement. *See id.* at 64-65, 109-110, 170-72. *See also* N.T., 4/12/2023, at 224-25.

Following the April 12th hearing, the record was closed. The following month, Cappuccio submitted to the Hearing Committee a post-hearing brief in support of reinstatement. The ODC filed a letter in lieu of brief, in which it stated that it did not oppose Cappuccio's reinstatement. On July 17, 2023, the Hearing Committee filed a report and recommendation. The Committee concluded that Cappuccio met his burden for reinstatement and recommended that his petition be granted. Neither party filed exceptions, and the matter was referred to the Board for adjudication.

On May 15, 2024, the Board issued a report and recommendation, disagreeing with the Hearing Committee and concluding that "[t]he misconduct for which [Cappuccio] was disbarred is so egregious that he should be forever barred from the practice of law in the Commonwealth of Pennsylvania." Board's Report and Recommendations, 5/15/24, at 31 (citing *Keller*, *supra*). The Board also found that Cappuccio "failed to meet his burden of proof by clear and convincing evidence that his resumption of the practice of law in the Commonwealth of Pennsylvania will be neither detrimental to the integrity and

---

[6] A co-worker and former paramour also testified in support of Cappuccio. *See* N.T., 4/3/2023, at 192 (co-worker describing Cappuccio as, *inter alia*, "extremely thorough," "extremely competent," and someone who "works incredibly hard"); *id.* at 135-36 (former paramour testifying to Cappuccio's candor in discussing his "past misconduct as an attorney").

standing of the bar or the administration of justice nor subversive of the public interest." *Id.* at 31-32 (citing Rule 218(c)(3)).

In support of the foregoing, the Board, relying on *Keller*, explained that it found "several factors unique to this case particularly significant" when considering Cappuccio's request for reinstatement. *Id.* at 35. First, the Board emphasized that at the time of his misconduct, Cappuccio was the Chief Deputy District Attorney in Bucks County, "making him [a] top law enforcement official[] in one of the largest counties in the Commonwealth." *Id.* at 35-36. *See also id.* at 36 (observing that Cappuccio's misconduct was "inextricably intertwined with the public office he held[,]" as his position allowed him to gain access to the minor victims, after which he supplied them with drugs and alcohol, before having several sexual encounters with one of the victims). Cappuccio's "abuse of power[,]" the Board explained, represented a "significant factor" in its analysis. *Id.* at 36.

Second, the Board highlighted the fact that Cappuccio's misconduct occurred over an extended period of time, "during which he engaged in a calculated and insidious plan to gain the trust of his three minor victims – doing so with the ultimate goal of sexually exploiting one of them." *Id.* *See also id.* at 36-37 (explaining that the record demonstrated that Cappuccio accompanied the minors to multiple concerts over a period of time and after supplying them with drugs and alcohol to appear "cool" to the minor to whom he was sexually attracted to, began a months-long relationship with the victim once he had reached the age of 16); *id.* at 37 (emphasizing that Cappuccio exhibited "an immense degree of arrogance and an utter disregard for the law" when he arranged yet another sexual encounter "after he was caught in a parking lot engaged in sexual activity with the minor"). The Board, using Cappuccio's own words, found that his misconduct was bore out of an "opportunity" to explore his own sexuality in secret. *Id.* In this regard, the Board,

while commending Cappuccio for taking responsibility for his actions,[7] found that the "breach of trust r[a]n too deep to overlook." *Id. See also id.* at n.5 (acknowledging that Cappuccio's sexual relationship with one of the victims did not begin until after the victim was 16 and, thus, over the age of consent, but emphasizing that "the corruption of minors statute is designated to protect all minors – including those legally capable of giving consent – from predatory adults looking to exploit them for sexual gratification").

Third, the Board discussed the "lasting damage" caused by Cappuccio's misconduct. *Id.* at 38. This included the "psychological toll" that Cappuccio had caused to one of his victims and the betrayal experienced by, *inter alia*, the parents of the minor victims. *Id.* In fact, the Board noted that one of the parents "involved in the church youth group detailed the lasting damage [Cappuccio] caused to the entire community." *Id.*

Taken together, the Board found that Cappuccio's "misconduct has no comparison in the case law" and, in its opinion, the nature of his wrongdoing is "so repugnant and offensive to the legal profession and the public interest in general, that it must prevent [Cappuccio] from ever resuming the practice of law in the Commonwealth." *Id. See also id.* at 39 ("In the Board's view, the systemic months-long scheme to take advantage of those who are in most need of protection – *e.g.,* the young, the elderly, the disabled – is among the most egregious acts of misconduct in which a lawyer can engage.").

Finally, the Board addressed the suggestion that the report issued in connection with Cappuccio's 2016 reinstatement request compelled it to conclude that Cappuccio satisfied the threshold requirement articulated in *Keller.* The Board explained that it was not beholding to the law of the case doctrine, as that principle, "by its plain terms, only applies to decisions made by a court" and the Board is not a court. *Id.* at 40. The Board

---

[7] Later in its report, the Board expanded on this particular point, acknowledging that Cappuccio presented "substantial evidence of the quality and quantity of the rehabilitation he has obtained." *Id.* at 44.

further opined that this Court's *per curiam* order denying reinstatement did not preclude a finding that Cappuccio failed to satisfy *Keller*, as the order did not specify the basis for its decision and thus, "should not be interpreted as an endorsement of the rationale articulated below." *Id.* at 40-41.

The Board likewise rejected any *stare decisis* argument, noting that this Court "has cautioned that *stare decisis* does not demand[] absolute fidelity to what came before" and, in certain cases, departure from a prior decision may be warranted. *Id.* at 41-42 (bracket in original; internal quotation marks omitted). With respect to this case, the Board found that the 2017 Board's determination that Cappuccio had satisfied *Keller* was "not grounded in particularly strong rationale." *Id.* at 42. *See also id.* (noting that the cases relied upon when reaching its decision were distinguishable, as none of the matters "involved lawyers who had betrayed the public trust by engaging in the very type of criminal conduct that they were responsible for prosecuting"). The Board also opined that finding the *Keller* standard had been met here would "render its threshold condition largely meaningless[.]" *Id.* at 43. *See also id.* at 44 (finding that to the extent Cappuccio relied on the prior *Keller* analysis, "such reliance was unreasonable because a disbarred attorney has no basis for an expectation … of the right to resume practice at some future point in time") (internal quotation marks omitted)).

In sum, while it did not question the Hearing Committee's factual findings as it pertained to Cappuccio's rehabilitation, *see id.* (observing that "by all accounts[, Cappuccio] has led an exemplary life since his disbarment"), the Board found that "some misconduct is so repugnant … that reinstatement cannot be permitted, regardless of" the remorse exhibited. *Id.* This, the Board concluded, was one of those cases. *See id.* at 44-45 (providing that if this Court were to disagree with its *Keller* assessment, it would recommend that Cappuccio's reinstatement be denied under Rule 218(c)(3), "on the basis

that he has failed to establish by clear and convincing evidence that his reinstatement would not be detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest").

In response to the Board's recommendation, Cappuccio filed a petition for review with this Court and the ODC submitted a "cross-petition for review." Via an order dated September 11, 2024, this Court directed the parties to file briefs, limited to the questions of whether Cappuccio satisfied the threshold standard under *Keller*, and, if so, whether he has met the Rule 218(c)(3) standard for reinstatement.

## II. STANDARD OF REVIEW

"In attorney discipline matters we exercise *de novo* review, and we are not bound by the findings and recommendations of the hearing committee or the Board, though we give them substantial deference." *Office of Disciplinary Couns. v. Quigley*, 161 A.3d 800, 807 (Pa. 2017) (citation omitted). *See also Keller*, 506 A.2d at 875 (recognizing that "[a]lthough we are free to evaluate the evidence presented before the Hearing Committee, … we may be enlightened by the decisions of these triers of fact who had the opportunity to observe the demeanor of the witnesses during their testimony"). Irrespective of any deference, however, this Court is required to "review [] the voluminous record presented to the [ ]Board[,] … including the transcripts of testimony provided at the evidentiary hearing before the Hearing Committee[.]" *Office of Disciplinary Couns. v. Baldwin*, 225 A.3d 817, 821 (Pa. 2020).

## III. DISCUSSION

### A. *Keller* Inquiry

"Our threshold inquiry in a reinstatement matter is whether the petitioner has demonstrated that his breach of trust was not so egregious that it precludes us from even considering his petition for reinstatement." *In re Perrone*, 899 A.2d 1108, 1113 (Pa. 2006)

(citing *Keller*, *supra*).  Beginning our examination here, we briefly summarize our decision in *Keller*.

In that case, we considered the Board's recommendation that Keller be disbarred for misconduct regarding both an estate matter and a real estate settlement.  It was alleged that Keller mismanaged funds and, among other acts, forged the endorsement on a check drawn on the account of an estate he was representing.  Keller contested this recommendation, urged this Court to reject the Board's proposed disposition, and suggested the imposition of a period of suspension.

In resolving the matter, this Court discussed the difference between suspension and disbarment.  *See Keller*, 506 A.2d at 874-75 (observing that there are both quantitative, *i.e.*, the amount of time an attorney is disallowed from practicing law, and qualitative differences between the two types of discipline).  For example, we noted that "[a]lthough reinstatement is provided for in the case of suspension (exceeding three months) and disbarment, the entitlement to reinstatement under the two sanctions is materially different.  *Id.* at 874 (internal citation omitted).  To wit, "[i]n the case of suspension the withdrawal of the privilege to practice law is for a specified period of time. ....  In contrast, where disbarment has been imposed, the length of the withdrawal of the privilege to practice law has not been previously determined." *Id*.

Additionally, in the case of disbarment, unlike suspension, "there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time." *Id.* at 875.  *See also id.* at 879 ("Disbarment is an extreme sanction which must be imposed only in the most egregious cases, because it represents a termination of the license to practice law without a promise of its restoration at any future time." (internal citations omitted)).  Thus, we clarified that "[w]hen reinstatement is sought by the disbarred attorney, the thres[]hold question must be whether the magnitude of the breach

of trust would permit the resumption of practice without a detrimental effect upon 'the integrity and standing of the bar or the administration of justice nor subversive of the public interest.'" *Id.* at 875 (citation omitted). Such an inquiry, we explained, would be unnecessary in cases involving suspensions, "since the initial order sets forth the period of time necessary to satisfy the breach of trust occasioned by the conduct which led" to the disciplinary proceedings. *Id.* at 875, n.5.

Ultimately, this Court found that a period of suspension would be an "inadequate response" to Keller's severe misconduct. *Id.* at 878. Consequently, we accepted the Board's recommendation and disbarred Keller from the practice of law. *See id.* at 879 ("Where an attorney converts and commingles entrusted funds, accomplishes this breach of trust by the use of forged documents, and employs misrepresentations to mask this covert activity, the magnitude of the derelictions and its impact upon the legal profession and the administration of justice requires the imposition of the most severe sanction at our command.").

Turning to the case *sub judice*, Cappuccio spends a considerable portion of his argument dedicated to admonishing the present Board's decision to depart from the 2017 Board's determination that he met his burden on the *Keller* issue.[8] *See, e.g.*, Cappuccio's Brief at 50 (arguing that the Board's departure from its own prior conclusion of law undermines the: (1) "fundamental fairness sought to be safeguarded by the law of the case doctrine[;]" and (2) "integrity of the disciplinary and reinstatement system by introducing arbitrariness in place of predictability, and lending the impression that the

---

[8] Cappuccio also highlights a portion of this Court's 2012 disbarment opinion. There, Cappuccio emphasizes, we observed that there "obviously are circumstances of disbarment which involve misconduct worse than that committed by" Cappuccio. Cappuccio's Brief at 48 (quoting *Cappuccio I*, 48 A.3d at 1241).

composition of a new Board is free to ignore a predecessor Board's careful analysis and conclusions of law, and that its decisions are only as binding as the length of its members' service"). However, in light of this Court's *de novo* standard of review, as well as our directive that the parties brief this issue, we need not contemplate the propriety of the Board's decision to deviate from the 2017 Board's findings. *See Bowling v. Off. of Open Recs.*, 75 A.3d 453, 466 n.14 (Pa. 2013) ("A *de novo* standard of review permits the court to determine the case *anew*, including matters pertaining to testimony and other evidence." (citation omitted; emphasis in original)). Accordingly, we proceed to review the parties' substantive arguments on the threshold *Keller* issue.

Presently, Cappuccio argues there is "zero evidence" that he is unfit to practice law. Cappuccio's Brief at 53 (emphasis in original omitted). Rather, he explains, the facts establish 15 years of qualitative rehabilitation, some of which was also spent working within the legal profession as a paralegal. In Cappuccio's view, the present Board opted to ignore the overwhelming rehabilitation evidence in favor of focusing exclusively on his misconduct that occurred more than a decade ago. *See id.* at 54 ("In focusing exclusively on [Cappuccio's] misconduct from over fifteen years ago, the 2024 Board ignored all of the record evidence concerning what has transpired in the last fifteen years as well as the present state of [Cappuccio's] character, fitness, and contributions." (emphasis in original omitted)). Stated differently, Cappuccio believes that the "Board simply failed to analyze this reinstatement petition in the totality of circumstances, giving outsized weight to remote misconduct with little to no consideration of [his] present-day character and competency[.]" *Id.*

Further, Cappuccio emphasizes that, should he be forever barred from practicing law in this Commonwealth, it would only be the second time such punishment has been imposed in the near 40 years since this Court issued our decision in *Keller. See id.* at 62-

64 (citing *In re Phillips*, 801 A.2d 1208 (Pa. 2002)).  On this point, he contends that permanent disbarment would be "grossly disproportionate not only to his evidence of substantial rehabilitation but to the vast body of disciplinary decisions handed down since *Keller* in which this Honorable Court has reinstated attorneys who have engaged in equally as serious or more egregious misconduct."  *Id.* at 55-56 (citing, *inter alia*, *In the Matter of Hall*, 1213 DD3 (Pa. 2015) (reinstating attorney convicted of homicide by vehicle related to driving under the influence and other offenses after he was disbarred in 2006); *In the Matter of Halfpenny*, 1483 & 1649 DD3 (Pa. 2024) (reinstating attorney, disbarred on consent in 2014, retroactive to a 2009 temporary suspension, who violated a protection from abuse ("PFA") order obtained by his former wife, entered a guilty plea to attempted burglary, stalking, and related offenses, and was later found to have possessed child pornography)).  Cappuccio insists that these cases illustrate that even attorneys who engage in misconduct resulting in death, plans to harm, and/or "the graphic abuse of hundreds of prepubescent children," are capable of meeting the *Keller* standard and have in fact, "been returned to the practice of law even while still on criminal supervision."  *Id.* at 58.

Addressing his former position as a Chief Deputy District Attorney, Cappuccio notes that "Former Attorney General Ernest D. Preate, Jr., who held an *elected* official position far higher than [Cappuccio] ever did as a hired prosecutor, was reinstated from a five [] year suspension for misconduct that occurred while he was an elected District Attorney."  *Id.* at 59 (citing *In re Preate*, 774 A.2d 731 (Pa. 2001) (emphasis in original)).  Cappuccio explains that because Preate was only suspended, and not disbarred, he did not face a *Keller* threshold.  However, Cappuccio believes that Preate's "position, charges, and sentence speak to a higher level of egregiousness[,]" and he was nevertheless able to resume the practice of law.  *Id.* at 59.  *See also id.* at 61-62

(emphasizing that his guilty plea resulted in a county sentence of 6 to 23 months, "significantly" less than what was imposed on other attorneys that were disbarred but subsequently reinstated).

Finally, Cappuccio asserts that the aforementioned misconduct he pled guilty to, while criminal and involving "serious violations of trust – which he fully admits and has been found to credibly express genuine remorse for – did not involve any of his official duties, cases, or clients." *Id.* at 61 (emphasis in original omitted). Thus, he contends, his case is "unlike those who have been convicted of direct attacks on the integrity of the legal system[.]" *Id. See also id.* at 63-64 (emphasizing that he took full responsibility for his misconduct and that his rehabilitation has been deemed "stellar" by the ODC). *See also id.* at 65 (insisting that his "case is far more similar to the dozens if not hundreds of reinstatements that have occurred in the nearly 40 years since *Keller* than it is to the singular circumstance of" *Phillips*).

For its part, the Board[9] confines its brief to its *Keller* argument only, as it now concedes that "Cappuccio has established by clear and convincing evidence that he meets the standards for reinstatement set forth in Rule 218(c)(3)." Board's Brief at 20, 49. *See also id.* at 49 (acknowledging that if this Court finds that Cappuccio satisfied the *Keller* threshold requirement, he would be entitled to reinstatement).[10] That said, the

---

[9] While this matter was pending, the Board filed an Application for Relief, seeking to submit a supplemental brief. Per the Board, it sought permission to expand on its argument, as detailed *infra*, that "*Keller* represents a meaningful legal principle that remains distinct from Rule 218(c)(3)." Application at 4. In the interest of completeness, we grant this uncontested request and consider the contents of this supplemental filing alongside the Board's originally filed brief.

[10] In his reply brief, Cappuccio categorizes this concession as "profound." Cappuccio's Reply Brief at 3. In his view, by acknowledging that his resumption to the practice of law would not be detrimental to the standing of the bar or subversive of the public interest, the Board "effectively conceded that *Keller*'s threshold inquiry … is met. *Id.* at 5. *See also id.* at 6 ("The concession is important and profound, for reinstatement proceedings (continued…)

Board continues to maintain that Cappuccio's misconduct "was so egregious that he should be forever barred from the practice of law in Pennsylvania." *Id.* at 19.

In support, the Board initially observes that the "*Keller* inquiry adds a searching layer of initial scrutiny to a disbarred lawyer's reinstatement bid." Board's Brief at 25. In other words, "[t]he inquiry surfaces the question of whether the underlying conduct is so egregious that disbarment must mean nothing less than what the word plainly indicates— a fundamental loss of the right to practice law based on the fundamental breach of trust that caused disbarment to occur." *Id.* With this in mind, the Board, acknowledging that *Keller* does not define the exact wrongdoing that meets this standard, consulted prior decisional law for guidance.

The Board opines that *Phillips*, *supra*, is a "natural starting point for comparison[,]" as it is the only case since *Keller* that involved an attorney being forever barred from the practice of law in Pennsylvania. *Id.* at 26. In that case, Phillips engaged in a conspiracy with, *inter alia*, a common pleas judge, to commit bribery and fix cases. He was subsequently convicted of conspiracy and sentenced to five years of incarceration, which later was reduced to three and a half years. As a result, Phillips was disbarred and, several years thereafter, sought reinstatement. Although the Board recommended that Phillips be reinstated, this Court, via a *per curiam* order, denied Phillip's request. *See id.*

The Board concedes that the facts in *Phillips* are different than the present matter. Nevertheless, it asserts the "underlying themes are the same."[11] *Id.* at 28. To wit, the

are not about punishment or further sanctioning of misconduct committed over fifteen years ago. Rather, reinstatement proceedings are about where matters stand at the present, and what will honor and serve the purpose of our system now, in 2024." (emphasis in original omitted)); *id.* at 13 (opining that the Board seeks for this Court to "count" Cappuccio's position as a prosecutor, already considered long ago when deciding between disbarment and suspension, twice).

[11] In his responsive filing, Cappuccio emphatically disagrees with the suggestion that *Phillips* supports his permanent disbarment. *See* Cappuccio's Reply Brief at 16-17 (continued…)

Board reiterates that Cappuccio engaged in criminal acts while employed as a Chief Deputy District Attorney. The Board continues by highlighting that as a top law enforcement official in Bucks County, Cappuccio committed acts that involved "corrupting three minor victims and endangering their welfare over an extended period of time while sexually exploiting one victim." *Id.* In the process, the Board explains, Cappuccio leveraged his position as, *inter alia*, a public prosecutor to earn the trust of the victims and their families. *See id.* (asserting that Cappuccio's "abuse of public trust threatened to compromise public confidence in a basic function of the legal system" and "represented no less grave an affront to the integrity of the legal profession than was presented in *Phillips*").

Expanding on the latter point, the Board explains that "Cappuccio's status as a public law enforcement official earned him the respect and trust of the victim's parents" and allowed him to "access their minor children." *Id.* at 29. *See also id.* (emphasizing that Cappuccio abused that trust on numerous occasions over an extended period of time); *id.* at 29-30 ("Cappuccio acknowledged that he sexually exploited [v]ictim #1 and viewed [v]ictim #1 as an 'opportunity' to 'explore' his sexual preferences in a way where he would not get caught and would be able to maintain his career and position in the District Attorney's office. Cappuccio waited to push a physical relationship until [v]ictim #1 was 16 years old – the age of legal consent, as Cappuccio would have known."). Stated succinctly, the Board maintains that "Cappuccio's acts amounted to criminal conduct by a lawyer who represented the embodiment of law enforcement – an inversion of core principles striking at the heart of public confidence in the legal system." *Id.* at 30.

---

(emphasizing that unlike Cappuccio, Phillips: (1) exploited his clients; (2) never expressed remorse for his crimes; (3) fought the charges in federal court; and (4) attempted to relitigate his misconduct during reinstatement proceedings).

Next, the Board compares the underlying matter to "post-*Phillips* cases," insisting that they provide "a benchmark for comparison" and support its recommendation that Cappuccio be permanently disbarred. *See, e.g., id.* at 33-42 (observing that: (1) in *Halfpenny*, the Board considered the fact that Halfpenny engaged in crimes "purely in his personal capacity and not in any way related to his law practice[;]" (2) in *In the Matter of Leshner*, 159 DB 2013 (D. Bd. Rpt. 11/10/2020), Leshner was disbarred (and later reinstated) for crimes committed before he became an attorney; (3) in *Hall* and *In the Matter of Kerr*, 44 DB 1985 (D. Bd. Rpt. 4/27/2007), the disbarred attorney that was granted reinstatement was not a "top prosecutor who used his position to manipulate and take advantage of others[;]" and (4) in *In the Matter of Sturm, III*, 23 DB 1981 (D.Bd. Rpt. 2/8/2011), Sturm was denied reinstatement, but was not forever barred from the practice, for misconduct that "involved purely private activity and did not implicate the public confidence in core features of the justice system"). In the Board's view, "the contrasting facts offered by these precedents ground support for the proposition that Cappuccio should be precluded from reinstatement under *Keller*'s threshold principles." *Id.* at 42. This is especially so, the Board contends, because "[n]one of the cases above involved a violation of public trust by a prosecutor or even the practice of law." *Id. See also id.* at 43 ("Those attorneys were not hypocritically enforcing the law while simultaneously breaking it.").

Finally, the Board encourages this Court to use this opportunity to "ratify *Keller*" and "indicate what disbarment ultimately can mean."[12] *Id.* at 44-45. *See also id.* at 45

_____

[12] The Board expands on this point in its supplemental filing. Specifically, the Board contends that *Keller* should remain good law, as the threshold requirement that must be met sets apart disbarments from suspensions. *See* Board's Supplemental Brief at 2 ("The standard does not consider the petitioner's post-disbarment activities. It does not ask whether the petitioner has achieved rehabilitation or performed restitution in the intervening years. It mandates a second review of the disbarred petitioner's misconduct (continued…)

("This Court should reaffirm that a qualitative difference exists between these two types of discipline and that *Keller* represents an ongoing threshold that every disbarred attorney must overcome."). In the same vein, the Board suggests that we reject any argument that we overturn the *Keller* standard or "remake the types of discipline available under" the disciplinary rules.[13] *Id. See also id.* at 48-49 (insisting that this Court's finding that a

---

itself, asking whether that misconduct was so grave that reinstatement may not even be considered."). Additionally, the Board maintains that "*Keller* and Rule 218(c)(3) apply different considerations to distinct bodies of evidence." *Id.* at 3. *See id.* at 3-4 ("As a threshold inquiry, *Keller* asks the Court to assess the disbarred attorney's wrongdoing. … Rule 218(c)(3) focuses on the post-disbarment time-frame and primarily explores the attorney's current fitness to resume practice."). In the same way, the Board rejects the suggestion by the parties that it made inconsistent statements regarding Cappuccio's fitness to return to practice. *See id.* at 5 ("*Keller* and Rule 218(c) are not overlapping inquiries. An attorney whose underlying conduct does not preclude reinstatement under *Keller* may fail Rule 218's petitioner-focused standards for reinstatement. Conversely, an attorney whose post-disbarment activities may support reinstatement under Rule 218's petitioner-focused inquiry may not be entitled to have those post-rehabilitation activities even be considered based on the egregiousness of the underlying conduct. (The Board has suggested that Cappuccio falls into this second category.)").

[13] This is responsive to an argument made by the ODC in its brief. In particular, the ODC views our quote in *Keller* concerning a threshold requirement as *dicta*. *See* ODC's Brief at 16 n.3 (opining that our "statement about reinstatement bore no relationship to the disposition"). In fact, the ODC finds "*Keller* itself is ambiguous and vague about two harsh features of its application[;] … its permanence and its bar on any consideration of rehabilitative achievements." *Id.* at 33. Per the Board, the ODC explains, rehabilitative efforts or passage of time does not factor into a *Keller* analysis. However, in its opinion, "[t]ime and good works" can, *inter alia*, "diminish the magnitude of the breach of trust[.]" *Id.* at 33-34. It therefore posits that this Court may want to "revisit and revise" the *Keller* standard. *Id.* at 32. *See also id.* at 32-33 ("In the nearly [40] years since *Keller* was decided, [this] Court only once has proclaimed that a petitioner be forever disbarred from the practice of law in this Commonwealth, … and has not provided further guidance on how ODC, Hearing Committees, or the Board should determine whether a petitioner's misconduct was so egregious that he or she never should be allowed to practice law in Pennsylvania again."). *See also id.* at 34-35 (observing that while a minority of sister jurisdictions have permanent disbarment as a form of discipline, it is a rule-based, and not a common law-derived, concept and further suggesting that the problems that have arisen in this case support this Court referring "the question of whether Pennsylvania should have permanent disbarment, and if so, under what circumstances, to the Disciplinary Board Rules Committee"); *id.* at 36 (emphasizing the unfairness of deciding (continued…)

disbarred attorney should have no expectation of the right to resume practice at some future point indicates that "some conduct voids the right to practice law *ab initio* no matter the good works done thereafter").

Preliminarily, to the extent that any party is advocating for this Court to revisit our decision in *Keller* or the standard announced in that case, we decline. Such a query was not presented to this Court by Cappuccio in his petition for review, *see* Petition for Review, 6/6/24, at 46 (requesting this Court reject the Board's recommendation and report and find that his prior misconduct "was not so egregious as to forever preclude his reinstatement, and" that he has "met all criteria for reinstatement") or by the ODC in its cross-petition. *See* Cross-Petition for Review, 6/18/24, at 13 (acknowledging "the threshold inquiry articulated in *Keller* and its progeny"). Nor is it fairly encompassed in the issues we directed the parties to brief. *See* Order, 9/11/24.

Moving on, in addressing the foremost issue plainly before this Court, *i.e.*, whether Cappuccio has satisfied the *Keller* threshold standard, we recognize that "[t]he primary purpose of our lawyer disciplinary system is to protect the public from unfit attorneys and to maintain the integrity of the legal system." *In re Perrone*, 777 A.2d 413, 415-416 (Pa. 2001) ("*Perrone I*"). "This momentous obligation stems from our constitutional mandate

_____

that Cappuccio is subject to permanent disbarment after his second request for reinstatement and nearly 15 years of rehabilitation).

The foregoing aside, the ODC echoes many of the same arguments set forth by Cappuccio, agreeing that he has satisfied the *Keller* threshold. *See id.* at 16-32 (arguing that: (1) Cappuccio's misconduct "pales beside that of" Phillips; (2) this Court recently agreed to the Board's recommendation to reinstate Halfpenny, whose case involved "misconduct far worse than here[;]" (3) the Board's standard is "hopelessly subjective and invites caprice and arbitrariness[,]" which is evinced by the fact that former public officials, once disbarred, have been reinstated despite committing "worse breaches of trust[;]" and (4) "decisions from other jurisdictions support [] Cappuccio's reinstatement" (unnecessary capitalization omitted)).

of regulating the practice of law in our Commonwealth." *Office of Disciplinary Counsel v. Marcone*, 855 A.2d 654, 658 (Pa. 2004).

"Pursuant to the requirements of *Keller,* [] we must consider first the nature of [the] misconduct." *Matter of Costigan*, 664 A.2d 518, 520 (Pa. 1995). We have previously explained that "[t]his threshold inquiry is somewhat coextensive with this Court's duty to determine whether [a petitioner] has met his burden under" Rule 218(c)(3). *Perrone I*, 777 A.2d at 415 n.3. This standard, "articulated in *Keller* and later clarified in [*Costigan, supra*,] merely recognizes the fact that some forms of misconduct are so egregious that they will forever bar the disbarred attorney from successfully seeking reinstatement." *Id.*

Importantly, we are cognizant that the *Keller* inquiry focuses on public interest and the damage the misconduct caused to the legal system. *See, e.g., Office of Disciplinary Counsel v. Stern*, 526 A.2d 1180, 1186 (Pa. 1987) ("In addition to protecting the public, it is our responsibility to seek to preserve public confidence in the legal profession and the judicial system."). In so holding, this Court reasoned "disciplinary sanctions are not primarily designed for their punitive effects." *Id.* at 1185. "Instead, disciplinary sanctions are intended to protect the public from unfit attorneys and maintain the integrity of the legal system." *Office of Disciplinary Counsel v. Christie*, 639 A.2d 782, 785 (Pa. 1994). *See also id.* (noting that "[t]he criminal laws of Delaware have already provided respondent with punishment for his abhorrent misconduct").

There have been countless cases where we have found that the breach of trust was not so egregious that it precluded us from considering a petition for reinstatement.[14]

---

[14] There have also been instances where attorneys, who committed sexual offenses, were suspended, rather than disbarred. *See, e.g.*, *Christie*, *supra*, 639 A.2d at 783-86 (attorney, suspended from the practice of law in Delaware after pleading guilty to thirteen misdemeanor sex offenses involving two minors was suspended, rather than disbarred, after it was determined that his sexual offenses were caused by a psychological disorder known as regressed homosexual pedophilia, for which extensive treatment had been (continued…)

*See, e.g., In re Greenberg*, 749 A.2d 434, 436 (Pa. 2000) (finding petitioner's misconduct, which involved fraudulent financial transfers and resulted in federal charges, was not "so great that he can never be reinstated to the bar"); *Costigan*, 664 A.2d at 520 (Pa. 1995) (opining that Costigan's misconduct, which involved the handling of an estate and resulted in the filing of multiple criminal charges for, *inter alia*, theft by deception and criminal conspiracy, "does not in itself bar consideration of his petition"); *Perrone I*, 777 A.2d at 414, 416 (finding that Perrone's misconduct, which involved "filing of false and misleading fee petitions which requested payment for legal services purportedly provided to indigent defendants in the City of Philadelphia" was not "so deplorable that he can never be reinstated to the bar"); *In re Lord*, 910 A.2d 1, 5 (Pa. 2006) ("In the instant matter[, p]etitioner was suspended for one year and one day after he over billed clients and submitted false travel vouchers to his law firm. . . . Petitioner continued to act as the attorney in three matters. He held himself out as an active attorney, pursued his cases and appeared at hearings. Petitioner's most egregious act concerned his misrepresentation to the court that he was not the John Lord who was suspended. When questioned by his employer, [p]etitioner lied about the matter. . . . These acts, while regrettable, do not serve to impede [his] request for reinstatement."). *See also In re Hall*, 643 F. App'x 159, 159–60 (3d Cir. 2016) (observing that disbarred Pennsylvania attorney, who pled guilty to homicide by vehicle after he drove his car while intoxicated and crashed

obtained); *In the Matter of Susi*, 733 DD3 (Pa. 2012) (attorney reinstated following five year suspension after he pled guilty to several criminal offenses which stemmed from an incident that involved furnishing alcohol to an 18-year-old client, who was working off the attorney's legal fee by performing odd jobs at the attorney's property and who subsequently passed out and awoke to the attorney performing oral sex on him without his consent); *In re Sangiamo*, 652 DD3 (Pa. 2006) (granting reinstatement to attorney who was suspended from the practice of law for 20 months following his conviction for corrupting the morals of a minor after he engaged in indecent sexual contact with a 16 year old).

into an oncoming car, killing the driver, was subsequently reinstated to the Pennsylvania Bar).

Of particular note, recently, in *Halfpenny*, *supra*, the Board, when considering Halfpenny's reinstatement petition, found that Halfpenny's possession of pornographic images of children, while "egregious," was "not so offensive as to forever bar [his] reinstatement under *Keller*." Report and Recommendations of the Board, 1/25/24, at 23. Significantly, Halfpenny's disbarment was not due to his possession of child pornography, for which he was criminally charged after his initial temporary suspension. The misconduct that led to Halfpenny's disbarment proceedings involved violating, on numerous occasions, a PFA order that had been obtained by his former wife and, on one particular occasion, included contacting his former mother-in-law, relaying that something bad was going to happen to all of them (including his former wife), arriving in his wife's backyard with a beige bag, and eventually fleeing the area and discarding the bag. The bag was later discovered to contain "a roll of duct tape, an extension cord, a book of matches, a pair of leather gloves, a black scarf, and 13-inch kitchen knife. [Halfpenny's] blood was found in several areas of the yard, on the outside of the house, and the surrounding patio area." *Id.* at 4-5. He was subsequently arrested and charged with multiple offenses, including attempted aggravated assault (which was later withdrawn by the prosecution), criminal trespass, stalking, terroristic threats, and violating a protective order. *Id.* at 4.

When assessing the *Keller* issue in *Halfpenny*, the Board explained that:

There is no doubt that the misconduct that led to [Halfpenny's] disbarment 14 years ago is extremely serious. . . .

Upon consideration of [Halfpenny] misconduct, we conclude that his acts are not so egregious as to prevent the possibility of reinstatement. There are numerous examples where the *Keller* threshold question has been met in cases where a petitioner was disbarred based on serious

criminal misconduct. *See, In the Matter of Sandra Couch Collins,* Nos. 141 DB 1996 & 37 DB 1998 (D. Bd. Rpt. 3/14/2022) (S. Ct. Order 5/4/2022) (attorney disbarred on consent following convictions for burglary, criminal trespass, interference with custody of children, concealment of whereabouts of a child, harassment, stalking, escape, and disorderly conduct related to kidnapping daughter during child custody dispute; conduct not so egregious to bar reinstatement); [*Leshner, supra*] (attorney disbarred on consent following conviction for conspiracy to commit wire fraud; was a co-conspirator in the Scarfo organized crime family before, during, and after law school; conduct not so egregious to bar reinstatement); *In the Matter of Philip G. Gentile*, No. 54 DB 2007 (D. Bd. Order 2/20/2018) (S. Ct. Order 3/16/2018) (attorney disbarred following convictions for grand larceny, cocaine possession, and passing bad checks; conduct not so egregious to preclude reinstatement); *In the Matter of Grahame P. Richards, Jr.*, No. 43 DB 1996 (D. Bd. Rpt. 8/23/2016) (9/21/2016) (attorney disbarred on consent for convictions for forgery, theft by unlawful taking, and theft by deception arising out of his misappropriation of more than one million dollars in client funds; conduct not so egregious to preclude reinstatement.).

*Id.* at 21-22.

In fact, it was only in *Phillips, supra*, that this Court found permanent disbarment appropriate. As indicated above, in that case, Phillips, a former assistant district attorney for the City of Philadelphia and Assistant United States Attorney for the District of Columbia, conspired with others while in private practice, including a now-former judge of the Court of Common Pleas of Philadelphia County, to "fix" cases. *See U.S. v. Phillips*, 874 F.2d 123 (3d. Cir. 1989) (explaining that Phillips had been implicated in four instances of case-fixing, one of which included paying then-judge Kenneth S. Harris $700 for a favorable ruling for his criminal client).

Here, in distinguishing the aforementioned cases where it was determined that the *Keller* threshold had been met, the Board appears to have focused, in large part, on Cappuccio's position in the District Attorney's Office at the time the misconduct occurred. In this regard, it is worth noting that there is no *per se* rule that an attorney, who committed misconduct while holding public office, is forever barred from the practice of law. *See ODC v. Pozonsky*, 177 A.3d 830, 847 (Pa. 2018) (Baer, J. concurring) ("I find it imperative

to dispel any notion that there is a *per se* rule requiring disbarment when a judicial officer is convicted of a crime."). *See also Office of Disciplinary Counsel v. Preate*, 731 A.2d 129 (Pa. 1999) (suspending, rather than disbarring, attorney who was charged with mail fraud for soliciting, either directly or indirectly, illegal cash contributions and filing false and materially misleading campaign finance reports while either the District Attorney of Lackawanna County or the Attorney General); *Office of Disciplinary Counsel v. Olshock*, 839 A.2d 175 (Pa. 2003) (attorney, in private practice while simultaneously employed as a First Assistant District Attorney, suspended for three years for mishandling estate funds). It so follows that, while a relevant consideration in disciplinary proceedings, *see Cappuccio I*, 48 A.3d at 1240 ("[T]he fact that a lawyer holds a public office, or serves in a public capacity, as here, is a factor that properly may be viewed as aggravating the misconduct in an attorney disciplinary matter."), an attorney's employment in public office does not serve as an automatic disqualifier in reinstatement proceedings.

While we find Cappuccio's misconduct to be abhorrent and an incredible breach of trust for which, as acknowledged by Cappuccio himself, disbarment was the appropriate reprimand, when compared to other cases that have met the *Keller* threshold, we cannot say that the circumstances underlying this matter completely bars consideration of his petition. As a matter of fact, in *Cappuccio I*, this Court acknowledged that it had encountered cases involving worse misconduct. *See id.* at 1241 ("We reiterate that each matter must be examined individually based on the totality of facts surrounding the convictions. There obviously are circumstances of disbarment which involve misconduct worse than that committed by [Cappuccio.]").

Within this context, and aware of *Keller*'s focus on the damage caused to the legal system, we find the only post-*Keller* case where we ordered permanent disbarment, *Phillips, supra*, distinguishable. As explained in detail above, *Phillips*, which was relied

upon heavily by the Board, involved an attorney that was engaged in case fixing. His actions struck at the heart of our legal system, as it compromised the integrity of the bar. Indeed, by utilizing his position as an officer of the court to garner favorable outcomes for himself and his clients, Phillips left a stain on the administration of justice.

Unlike in *Phillips*, Cappuccio's misconduct, while offensive in its own right, did not involve the same level of intertwinement with his legal employment. In other words, it is clear that although he was deemed trustworthy due, in part, to his employment with the District Attorney's Office, he gained access to his victims *vis-a-vis* his position as a Youth Fellowship Group Leader at his local congregation. *See, e.g.,* N.T., 1/13/17, at 200 (Cappuccio testifying that he was a youth pastor and "[i]n that capacity, [] met a boy, and ultimately after several months of texting and having contact there at the church, [] offended and committed criminal offenses"). In this respect, there appears to be no allegations that Cappuccio exploited his status as a public official to get away with his crimes, as he admitted to the allegations once confronted. *See* 2017 Board's Report and Recommendation, 11/27/17, at 15 ("[Cappuccio] accepted full responsibility for his misconduct, entered a guilty plea, never denied his misconduct, and fully cooperated with the district attorney and [ODC]."). Nor has the current Board, or any other party to this matter, asserted that Cappuccio's misconduct continues to detrimentally impact the Bucks County District Attorney's Office.

In all, Cappuccio's actions, including engaging in criminal acts while employed as a prosecutor, warranted serious discipline, which he received through our criminal justice system and resulted in his disbarment from the practice of law. That said, at this juncture, we are not tasked with determining the proper punishment for his crimes. With this at the forefront, and cognizant of the decisions that came before, *see Office of Disciplinary Counsel v. Lucarini*, 472 A.2d 186, 190 (Pa. 1983) ("[W]e are mindful of the need for

consistency in the results reached in disciplinary cases so that similar misconduct is not punished in radically different ways"), we disagree with the Board that permanent disbarment is appropriate.

By finding that the *Keller* threshold has been met here, we are not condoning or minimizing Cappuccio's professional misconduct.[15] Rather, we merely conclude that Cappuccio's conduct does not serve as an "outright bar to our consideration of his petition for reinstatement." *In re Verlin*, 731 A.2d 600, 602 (Pa. 1999).

### B. Pa.R.D.E. 218(c)(3)

Having determined that Cappuccio's misconduct does not in itself bar consideration of his petition, we must now address whether Cappuccio has met his burden under Rule 218(c)(3). To reiterate, this rule provides that a disbarred or suspended attorney has the burden of demonstrating, by clear and convincing evidence, that he "has the moral qualifications, competency and learning in law required for admission to practice law in this Commonwealth and that [his] resumption of the practice of law within the Commonwealth . . . will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest." Rule 218(c)(3). "Inevitably, meeting the requirements of [R]ule 218(c)(3)[] will involve the petitioner's coming to terms with the conduct which caused his disbarment. In other words, the petitioner must demonstrate not only that he understands the nature of his wrongdoing, but also he must convince this court that he is not predisposed to commit future ethical infractions." *Costigan*, 664 A.2d at 520. *See also Lord*, 910 A.2d at 6 (explaining that Rule 218(c)(3) requires consideration of, *inter alia*, "the quantity of time

---

[15] To reiterate, with respect to this case, because *Cappuccio I* involved determining the proper discipline for Cappuccio's misconduct and his first reinstatement petition was denied by this Court after Cappuccio indicated he would accept the Board's recommendation, this is the first time we are assessing whether Cappuccio has satisfied the threshold *Keller* standard.

that has passed since [the p]etitioner was disbarred and his efforts at a qualitative rehabilitation").

As indicated above, both Cappuccio, supported by the ODC, and the Board agree that he has met his burden under Rule 218(c)(3). *See* Cappuccio's Brief at 20-21 ("[T]he record of the last fifteen years of [Cappuccio's] life is replete with overwhelming reform and sustained positive change, change resulting from his complete acceptance of responsibility, remorse, engagement in treatment and community service, and his drive to make amends and set an example of integrity for his two minor sons. Moreover, the last eight years since his first reinstatement petition have been marked by additional community service work, his assistance of law enforcement in a difficult investigation, his steadfast commitment to raising his two boys, his deepened learning of the law through ongoing paralegal work, and his demonstration of continued adherence to the law and the Rules of Disciplinary Enforcement."); Board's Brief at 49 ("[T]he Board concedes that Cappuccio has established by clear and convincing evidence that he meets the standards for reinstatement set forth in Rule 218(c)(3)."); ODC's Brief at 36-39 (explaining that "Cappuccio has proven himself an exemplary candidate for reinstatement" via his own actions, including his valued employment as a full-time paralegal, and the testimony of multiple witnesses, some of which have held or currently hold public office, thus confirming that those in public positions "are not only able to forgive [Cappuccio's] misconduct, but they also are able to partner with him and trust his work, leading them to endorse his petition for reinstatement"). After undertaking our own independent review of the record, we agree Cappuccio has met his burden.

Nearly sixteen years have passed since Cappuccio's retroactive disbarment on July 30, 2009. Over this period, Cappuccio has twice sought reinstatement, and the significant time that has passed since his disbarment has afforded this Court with an

opportunity to evaluate the breadth of Cappuccio's rehabilitation and remorse, as discussed in greater detail below. In our view, this length of time is significant enough "to dissipate the detrimental impact of [Cappuccio's] misconduct on the integrity and standing of the bar, the administration of justice, and the public interest." *Verlin*, 731 A.2d at 602. In so finding, it bears repeating that no party has argued to the contrary. *See, e.g.*, Board's Brief at 49.

Directing our attention to Rule 218(c)(3)'s rehabilitative factor, following his arrest and through the completion of his incarceration and period of probation, Cappuccio has been treated by psychologists who subsequently provided favorable testimony on Cappuccio's behalf. Of significance, Dr. Valliere testified that Cappuccio completed an intense, difficult treatment program and as of 2022, had maintained the "significant gains he made during his treatment." Valliere Letter, 12/20/2022, at 1. Cappuccio has never been diagnosed with pedophilia or any sexual disorder of that nature, and Dr. Valliere relayed that she did not have concerns of Cappuccio "committing any type of criminal offense." *Id.* at 2.

Per the record, during his disbarment, Cappuccio sustained an amicable co-parenting relationship with his ex-wife, was an involved parent, and held a variety of jobs, eventually obtaining full-time employment as a paralegal. Through his work at Bruno Law, Cappuccio has continued to learn in the law and, over the entire course of his disbarment, has completed numerous Continuing Legal Education courses. *See* Exhibit P-2023-11; N.T. 04/12/23, at 37.

Collectively, through both reinstatement proceedings, Cappuccio presented the testimony of over a dozen witnesses, including a former New Jersey Superior Court judge, a retired police lieutenant, and several former and current co-workers. Together, these witnesses commented on Cappuccio's positive rehabilitation, which the 2017 Board

described as including "transformational changes." 2017 Board's Report and Recommendation, 11/27/17, at 28. *See also id.* at 23 ("The record is essentially unrefuted, and replete with evidence that during that time frame, [Cappuccio] engaged in qualitative rehabilitation."). In addition, several witnesses testified to Cappuccio's professionalism and reputation for being truthful and law-abiding. *See* N.T., 1/13/17, at 82, 109-132, 170-171; N.T., 4/3/23, at 63; 167-168. Numerous members of the bar also expressed their support for Cappuccio's reinstatement bid.

Critically, Cappuccio has expressed remorse for his misconduct, and has reflected, on numerous occasions, on his actions and the damage they have caused. N.T., 4/12/23, at 97-98 (Cappuccio candidly testifying that he was remorseful for his actions and understood that he "hurt so many people"); *id.* at 98-99 (agreeing that disbarment was the appropriate discipline for his actions, which he recognized were "reprehensible"); *id.* at 100 (explaining that after he was discharged from treatment, he voluntarily spent time assisting Dr. Valliere with her program because he did not want his "story to be anyone else's story going forward"); *id.* at 114 (insisting that he is more prepared to reenter the practice of law than when he first began practicing); Board's Report and Recommendations, 5/15/24, at ¶ 60 (acknowledging that Dr. Valliere testified that Cappuccio "accepted responsibility and expressed remorse and insight for his misconduct"); 2017 Board's Report and Recommendation, 11/27/17, at 23 ("[Cappuccio] is extremely remorseful and fully accepts responsibility for his actions. He was completely credible, even when it required painful self-examination of his actions."); N.T., 1/13/17, at 201-02 (Cappuccio expressing his full acceptance for his misconduct).

In our view, the foregoing makes clear that Cappuccio has confronted his misconduct and appropriately recognized his wrongdoings. Through, *inter alia*, his meaningful self-reflection and decade and a half of qualitative rehabilitation, Cappuccio

has proven, by clear and convincing evidence, that he "is not predisposed to commit future ethical infractions[,]" *Costigan*, 664 A.2d at 520, and has "the moral qualifications, competency and learning in law required for admission to practice law in this Commonwealth and that" his resumption of the practice of law within this Commonwealth "will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest." Rule 218(c)(3). *See also Philadelphia Newspapers, Inc. v. Disciplinary Bd. of Supreme Ct.*, 363 A.2d 779, 780–81 (Pa. 1976) ("A reinstatement proceeding is a searching inquiry into a lawyer's present professional and moral fitness to resume the practice of law. The object of concern is not solely the transgressions which gave rise to the lawyer's suspension or disbarment, but rather the nature and extent of the rehabilitative efforts he has made since the time the sanctions were imposed, and the degree of success achieved in the rehabilitative process." (footnote omitted)).

For these reasons, we reject the recommendation of the Board and grant Cappuccio's petition for reinstatement. We further order Cappuccio to pay the costs associated with processing his petition pursuant to Pa.R.D.E. 218(f)(2).

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Brobson and McCaffery join the opinion.